Vanessa R. Waldref
United States Attorney
Eastern District of Washington
Richard R. Barker
Assistant United States Attorney
Post Office Box 1494
Spokane, WA  99210-1494
Telephone: (509) 353-2767

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                Plaintiff,<br><br>v.<br><br>RONALD CRAIG ILG (a/k/a "SCAR215"),<br><br>                Defendant. | Case No.: 2:21-CR-00049-WFN-1<br><br>United States' Opposition to Defendant's Second Motion for Release |

Plaintiff, United States of America, by and through Vanessa R. Waldref, United States Attorney, and Richard R. Barker, Assistant United States Attorney for the Eastern District of Washington, respectfully submits this Opposition to Defendant's Second Motion for Release. As explained below, as well as for the reasons set forth at the first two detention hearings in this case, the United States respectfully urges this Court to deny Defendant's release.

**INTRODUCTION**

Defendant Ronald Craig Ilg, also known as Scar215 (hereafter "Defendant" or "Ilg") has once again moved for pretrial release even though Judge John T. Rodgers denied release twice. *See* ECF Nos. 16, 48-49. Defendant's motion for his release correctly notes that detention "may be reopened . . . at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time of the

United States' Response to Defendant's Second Motion for Release - 1

hearing and that has a material bearing on . . . whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any person and the community." 18 U.S.C. § 3142(f). Defendant's arguments, however, are not based on anything new. Defendant previously has presented a psychological evaluation in support of release. The only difference now is that Defendant – several months after the last detention hearing – has now hired a second psychologist, who agrees with the first. This second evaluation is largely based on a single zoom interview with Defendant, and, in some respects, the evaluation actually contradicts the prior one. As set forth below, the existence of a second psychological evaluation does not justify release of a defendant who attempted to have a former colleague severely beaten and arranged for a hitman to kidnap his then-estranged wife.

More importantly, in the time since Judge Rodgers issued his latest order denying release, additional information has come to light reflecting Defendant's efforts to contact the witnesses in this case. Defendant wrote a letter begging a witness to marry Defendant so the witness wouldn't have to testify against him. *See* Ex. A. Defendant also sought to pay for this witness's children to attend private schools in Spokane if this witness returned to the abusive relationship with Defendant. *Id.* Additionally, evidence recently obtained through a Google search warrant indicates Defendant sought to procure "a slave," who, among other things, would be caged, flogged, and assaulted. *See* Ex. B. Additional evidence further demonstrates Defendant poses a risk to his minor child based on video evidence obtained during the investigation. *See* ECF No. 41 at 10, ln. 7-12.[1]

---

[1] This video was described in greater detail in the United States' sealed response to Defendant's prior motion for release. *See* ECF No. 41 at 10, ln. 7-12. The United States will make the video available to the Court if requested to do so.

United States' Response to Defendant's Second Motion for Release - 2

Most importantly, the nature and circumstances of this case demonstrate the lengths to which Defendant will go to surreptitiously harm those close to him. As established at the two prior detention hearings,[2] this is a case involving Defendant's efforts to have his wife kidnapped, beaten, injected with heroin, and extorted. Defendant even paid about $50,000 to put this plan into effect. All this happened while Ilg was subject to a protection order, precluding him from contacting his wife. Separately, Defendant paid a dark web hitman to physically assault a former colleague – directing the hitman to "injure both hands significantly or break the hands." ECF No. 1 at 5. Simply put, there is no condition or combination of conditions that would protect the community and ensure Defendant's return to court. There also is a risk of obstruction if Ilg was released.

---

[2] FBI Special Agent Ryan Butler testified at the initial detention hearing on April 21, 2021. During his testimony, Special Agent Butler authenticated a number of exhibits (Orig. Det. Ex. Nos. 1 – 15) and swore to the complaint affidavit contained in ECF No. 1. *See* ECF No. 15 (minute entry from initial detention hearing). The United States hereby incorporates Special Agent Butler's testimony and incorporates those exhibits by reference. The materials from the initial detention hearing are attached hereto as Exhibit D. After Defendant moved to reopen detention, the United States filed a sealed opposition along with various exhibits, which are set forth at ECF No. 41. Certain audio files – including audio of an April 8, 2021 assault by Defendant against WITNESS 1 as well as jail calls in which Defendant obsessed over WITNESS 1 and attempted to contact her – were submitted as a non-scannable exhibit attached to United States' Opposition to Defendant's First Motion for Release. *See* ECF No. 41, Ex. 10. For the Court's convenience, these audio files are enclosed herewith. *See* Ex. C (non-scannable exhibit). The United States also hereby incorporates these prior filings and exhibits by reference.

United States' Response to Defendant's Second Motion for Release - 3

# DISCUSSION

**A. No Conditions Can Adequately Ensure the Safety of the Community.**

Under the Bail Reform Act, this Court must consider the following factors in deciding whether to detain a defendant: "(1) The nature and circumstances of the offense charged . . .; (2) the weight of the evidence. . . ; (3) the history and characteristics of the person, including . . . family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, . . . ; and . . . (4) The nature and seriousness of the danger to any person or the community that would be posed by the person's release . . . ." 18 U.S.C. § 3142(g). Each of these factors weighs in favor of Defendant's continued detention. Nothing has changed since Judge Rodgers ordered Ilg detained in his matter on April 27, 2021 and June 15, 2021. *See* ECF Nos 16 and 48-49.

1. *Nature and Circumstances of the Offense and Weight of the Evidence*

To begin, the nature and circumstances of this offense demonstrate the risk Defendant poses if released. Defendant used the dark web moniker "Scar215" in early 2021 to hire hitmen to assault a former colleague (VICTIM 1) and to kidnap Defendant's wife (VICTIM 2). *See* ECF No. 1. Among other things, Defendant transferred a total of approximately $51,678.39 in Bitcoin currency to arrange for the hitmen to (i) physically assault the former colleague – i.e., by breaking her hands; and (ii) kidnap Ilg's wife, extort her, and inject her with heroin. Using the moniker Scar215, Defendant even structured a complex bonus structure for paying one of the hitmen, who purported to be affiliated with the "Sinaloa Cartel," if certain goals relating to Ilg's then wife were achieved:

> To earn the additional associated bonus, within 2 weeks of the target being released, she will have completed the specific goal. 1. Permanently withdraw all court motions and all mediated agreements. Bonus $10k 2. Return to your husband by asking to move back home AND fucking him at least three times within the 2 week time frame Bonus: $10k 3. Keep her mouth shut and tell no one, ever about the kidnapping Bonus $10k 4. Inject

United States' Response to Defendant's Second Motion for Release - 4

> her daily with heroin and teach her to do it AND supply pics and videos of her injecting herself. $5k 5. Plant drugs and used needles with her DNA in the needles through her home. Provide some pics of drugs and needles scattered around $5k

*Id.* (grammatical and typographical errors in original)

The government's case, while the least significant factor under 18 U.S.C. § 3142, is a strong one. The Federal Bureau of Investigation ("FBI") identified Defendant as Scar215 through various means. First, a locked biometric safe, which FBI accessed via Ilg's fingerprint, was located during a search of Ilg's home. ECF No. 1 at ¶14. Inside, the FBI located a handwritten note with the username and a password utilized to access the dark websites. *See id.* This username and password also were located in pictures on Defendant's phone and inside a book in Ilg's luggage from a then-recent trip to Mexico. *See* ECF No. 41, Ex. 1 (photo Ilg's book). Defendant's then-current girlfriend, WITNESS 1, also took screenshots of the username and password, which she observed on Ilg's phone and thought looked suspicious. ECF No. 41, Ex. 2. These photographs contained certain dark web addresses and bookmarks linking to the dark websites Ilg used to hire and pay the hitmen. *Id.* Using these dark web addresses and the login credentials that Defendant stored inside in various places – i.e., his biometric safe, his cell phone, his book, and as depicted in photographs WITNESS 1 took of Ilg's phone – the FBI recovered several of the actual dark web messages in which Defendant transacted for a hitman to kidnap, extort, and harm his then-estranged wife. *See* ECF No. 1 at ¶¶ 6, 14. Further investigation revealed ILG also was seeking to hire a hacker on the dark web to arrange computer intrusions targeting his wife. ECF No. 41 at Ex 3.

Records of the Bitcoin transactions further link Defendant with Scar215 and the kidnapping plot. ECF No. 1 ¶¶ 12-13. These transactions were conducted through Defendant's Coinbase.com cryptocurrency account, which was registered using Defendant's name, date of birth, social security number, email address, and phone number. *Id.* There also are photos of Defendant purchasing Bitcoin at a Bitcoin ATM.

United States' Response to Defendant's Second Motion for Release - 5

The timing of these transactions also coincides with the transactions referenced in the dark web messages recovered using the login credentials recovered from Ilg's safe, book, and on his various electronic devices.

Ilg's own statements and actions further confirm his identity as Scar215. In his interview with the FBI, Defendant identified himself as "Scar2something." ECF No. 1 at ¶21. Defendant did not deny it was him when confronted with the name "Scar215," responding, "mm-hmm." *See* Bates 40000002 at 57:00 – 57:20 (Defendant's non-custodial interview). Additionally, from Defendant's phone, FBI recovered what appear to be talking points Ilg drafted in the event law enforcement confronted him. In this document, Defendant admitted to using Bitcoin to pay hitmen on the dark web, specifying he paid more than $40,000, including bonus payments, to a dark website identified as the "s c" hitmen. *See* ECF No. 41, Ex. 4. During the interview with FBI, Defendant claimed that he hired the hitman to kill himself and added he never intended to harm his estranged wife. ECF No. 1 at ¶¶22 – 23. Later in the interview, however, when confronted with the contents of the dark web messages, and when asked to provide the username and password for the accounts so that the FBI could identify and stop the purported hitman from hurting anyone, Defendant implicitly acknowledged he wasn't being forthcoming and explained, "I would love to help out the best way that I can – to provide you guys whatever it is that you need – but at the same time I need somebody with a clearer mind than me to help navigate that." *See* Bates 40000002 at 1:33:28 – 1:37:25.

The same night FBI contacted Ilg, he attempted to commit suicide – taking approximately 40 Xanax pills. In a suicide note, Defendant prayed for forgiveness,

United States' Response to Defendant's Second Motion for Release - 6

acknowledged that he destroyed his estranged wife's heart, and described his actions as an "[i]rreparable fuck up." ECF No. 1 at ¶25.[3]

2. *Defendant's Arguments Pertaining to Suppression are Not a Basis for Release*

Defendant directs this Court to grant his release, because, according to the defense, certain of the evidence against Ilg ultimately may be subject to suppression. ECF No. 63 at 9. Specifically, Defendant asks this Court to "consider suppression issues and the admissibility of evidence at trial." *Id.* On the applicable law, Defendant is wrong. Title 18 U.S.C. § 3142(f) speaks to this issue: "The rules concerning the admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the [detention] hearing."

Notwithstanding the plain text of § 3142(f), Defendant apparently is asking this Court to adjudicate potential suppression arguments that are not properly before this Court. ECF No. 63 at 9. In support of this novel approach, Defendant cites to *United States v. Jay*, in which the District of Oregon considered whether evidence that had actually been suppressed for trial purposes was nonetheless admissible for purposes of a detention hearing. 261 F. Supp.2d 1235, 1241 (D. Or. 2003). *Jay*, however, is of no

---

[3] Defendant's latest briefing does not specifically address the nature and circumstances of the offense alleged against him. Rather, defense argues simply that because "the Government does not allege that [Defendant] used a firearm 'in further[ance] of any such crime,'" the nature and circumstances of the offense weigh in favor of release. *See* ECF No. 63 at 9. Defendant's argument does not meaningfully address the pertinent allegations and evidence in this case, which demonstrate extreme risks to the two VICTIMS and WITNESS 1, who each have described the terrifying threats that Defendant presents to those who oppose him. Notably, each of the VICTIMS as well as WITNESS 1 strongly support continued detention in this case.

United States' Response to Defendant's Second Motion for Release - 7

help to Defendant's position. There, the District of Oregon held that consideration of the challenged evidence, which again actually had been suppressed for purposes of trial, was absolutely proper. The district court reasoned:

> A court should have as much information as possible to evaluate properly whether a defendant poses any risk of danger to the community if released. Thus, even though this Court suppressed evidence for purposes of trial, that evidence may speak loudly concerning community safety . . . . The Court concludes, therefore, consideration of the suppressed evidence is warranted under cost-benefit analysis, particularly when applying the statutory release factors that bear on community safety.

*Id.*; *see also United States v. Pina-Aboite*, 97 Fed App'x 832, 835 (10th Cir. 2004) ("In a detention hearing, the district court is permitted to consider the evidence sought to be suppressed as if it were admissible."); *United States v. Fulgham*, 2012 WL 2792439, at *2 (N.D. Cal. 2012) (denying release even though "much or all of the evidence supporting the charge against Defendant ha[d] been suppressed" and noting that it was "unlikely that Defendant will be convicted of the crime (unless the suppression is overturned on appeal).").

In short, even under the authority cited by Defendant, evidence that Defendant attempted to hire multiple dark web hitmen to harm his former wife and a work colleague is properly before the Court for purposes of detention. Defendant's allusions to potential suppression issues[4] are not the type of changed circumstance that would warrant reconsideration of Defendant's detention.

---

[4] To be clear, Defendant's suppression arguments lack merit. While Defendant contends the search warrants signed by Judge Rodgers are based on a single anonymous source, he is wrong. *See* ECF No. 63 at 10. Among other things, Defendant's text messages with WITNESS 1, which were set forth in the initial search warrants, reflected that Ilg "hired someone to hurt [VICTIM 2] from the dark web using bitcoin." *See* 2:21-MJ-00203-JTR at ¶17. To the extent Defendant argues he was in custody at the time of

United States' Response to Defendant's Second Motion for Release - 8

3. *Defendant's History and Characteristics Continue to Warrant Detention*

Defendant understandably points to his career in medicine and limited criminal history. ECF No. 63 at 12-13. While it is true that these circumstances, standing alone, favor release, Defendant's more recent history should guide the Court. Defendant has demonstrated an escalating pattern of criminal conduct, which he conducted surreptitiously over the dark web. He has demonstrated that he engages in violence – or solicits others to do so – when he loses control over those closest to him. Given Defendant's conduct before and during the pendency of this investigation, this factor does not weigh in favor of release in this case.

4. *Risk to the Safety of the Victims and the Community*

The risks to VICTIMS 1 and 2 are apparent from the face of the Indictment and affidavit in support of the complaint. *See* ECF Nos. 1, 22. In fact, the actions directed at VICTIM 2, Defendant's then estranged wife, occurred while Defendant was subject

---

his interview at the Spokane International Airport, ECF No. 63 at 11, the recorded interview shows otherwise. Bates 40000002 at 10:18, 22:51 (FBI agents asked whether Defendant would accompany them to a conference room, and Defendant agreed. At various points in the interview FBI told Ilg he was free to go. In fact, near the beginning of the interview, Ilg told the FBI Agents he was willing to catch an Uber if he needed to and he sent a message to WITNESS 1 telling her to leave the airport without him. After the interview, Ilg was offered a ride to his home instead of taking an Uber. Ilg accepted the ride). Finally, while Defendant asserts there are complex issues pertaining to the admissibility of cryptocurrency and blockchain analysis, Defendant provides no authority that such evidence would be inadmissible here. *See* ECF No. 63, at 11 – 12. Accordingly, this Court should reject Defendant's invitation to weigh in on suppression issues that have not been properly briefed and argued before Judge Neilsen, who presides over this case.

United States' Response to Defendant's Second Motion for Release - 9

to a no-contact order. *See* Ex. E (Bates 70000011). The danger, however, is not limited to the named victims. Defendant also has manifested abusive behavior toward WITNESS 1. In statements to the FBI, WITNESS 1 described being sexually assaulted by Defendant and stated that Defendant physically assaulted beyond her consent. ECF No. 41, Ex. 7 at 3 ("Ilg pinned [WITNESS 1] against a wall in the bathroom and forced himself on her"). WITNESS 1 further explained that Ilg forced her into a dark hole, required her to sign a "master-slave" contract in blood against her will, and burned her with a cattle prod. ECF No. 41, Ex. 8 at 4; Ex. 7 at 3. According to WITNESS 1, Ilg physically abused her in Mexico, which is corroborated by an audio recording from that trip. In the recording WITNESS 1 begged to be left alone and struggled to breathe as Defendant assaulted her. *See* ECF No. 41, Ex. 9 at 2; ECF No. 41, Ex. C (4.8.21 Audio) at 12:30 – 17:31.

Defendant's young son also may be at risk if Defendant is released. A video recovered during the investigation depicts Defendant engaging in conduct reflecting recklessness, a disregard for social norms, and risking his own child's wellbeing. *See See* ECF No. 41 at 10, ln. 7-12 (filed under seal). Finally, and consistent with statements from eyewitnesses to Defendant's actions, Defendant, prior to his arrest in this case, was attempting to obtain what he described as a "slave." *See* Ex. B. In messages obtained from a google account associated with Defendant[5] and containing his photographs, Defendant was soliciting a "slave" in March 2021 against the will of Defendant's then-estranged wife and girlfriend:

> My wife and gf don['] want anyone else but I[']m the boss and I want a third
>
> I need a slave in the US
> who has a job

---

[5] WITNESS 1 informed law enforcement of this email account associated with Defendant.

United States' Response to Defendant's Second Motion for Release - 10

> can take care of me my wife and my sub and our dice [sic] kids
> can cook and clean
> I[']m type A need it perfect
> will run errands
> will iron
> will take care of animals and yard and snow
> who will be caged when told and beaten
> whipped
> flogged
> canned [sic]
> burnt
> pissed on
> tied up etc.
> a real slave who gets nothing until they are told who serves
> I need a real slave and I[']m not paying anyone anything to get one
>
> I have a huge house and I[']m a doctor but have two women already

Ex. B at 1-2.

Defendant's motion, rather than addressing Defendant's disturbing and violent behavior, focuses on assessments from two psychologists funded by the Defense. *See, e.g.*, ECF No. 63 at 13. These evaluations opine that Defendant "does not pose a substantial danger to others in the community." *Id.* The limitations of the initial psychological assessment are discussed in detail in the United States Opposition to Defendant's First Motion for Release. *See* ECF No. 41 at 10-12 (explaining that the initial physiological assessment faced "challeng[es] to form[ing] a confident and reliable opinion" and was based on a "relatively limited data pool"). That first assessment further caveated that if Ilg had in fact solicited hitmen from the dark web to harm VICTIM 1 and kidnap VICTIM 2, then Defendant posed a serious risk of danger:

> The above formulation does not consider the current allegations against Dr. Ilg. If he did commit the crime alleged, it would indicate a capacity for extreme antisocial behavior which he had previously kept hidden otherwise suppressed.

ECF No. 41 at 13.

United States' Response to Defendant's Second Motion for Release - 11

Defendant's second assessment, which is dated October 7, 2021, does not change the detention calculus. Notably, while the new assessment concludes Ilg does not pose a substantial danger to harming others, the assessment reached this conclusion by "separating out *requests* to harm others from *acted on* physical violence." ECF No. 63, Ex. A at 3 (emphasis in original). This conclusion – that Defendant does not pose a risk of violence because he paid others to harm his victims – belies common sense. The primary risk of danger is Defendant's surreptitious attempts to pay large sums of money to harm those close to him even when subject to a protective order. Yet, the most recent assessment declines to take this risk into account. *See id.*[6]

The most recent evaluation further observes that "despite the seriousness of [Defendant's] alleged actions, these behaviors, while serious, were not the result of a psychopathic outlook or propensity toward violence." *Id.*, Ex. A at 4. Rather, the alleged violent behaviors "were strongly driven and influenced by various other external contributing factors (e.g., loss of work, separation from wife and child, etc.)." *Id.* In other words, the new assessment concludes Defendant is not naturally violent, but resorts to violence when things in his life do not go according to plan. This should leave the Court with little comfort. Defendant remains unemployed. His family situation has

---

[6] Of course, and as set forth above, the risk of violence is not limited to Defendant's surreptitious activities on the dark web. Again, Defendant subjected WITNESS 1 to physical abuse, as she has consistently maintained throughout these proceedings. Defendant's recorded actions – which, at the very least, are reckless – also placed his minor child at risk. *See* ECF No. 41 at 10, ln. 7-12 (sealed). Notwithstanding the foregoing, the recent assessment opines that "Ilg has no known history of acting aggressively or physically violent toward others." ECF No. 63, Ex. A at 3. Apparently, the report writer was not aware of the assaultive and abusive conduct described by WITNESS 1.

United States' Response to Defendant's Second Motion for Release - 12

not improved since his arrest – he remains separated from his ex-wife, and his former partner, WITNESS 1, left him. There also is a restraining order precluding Defendant from having any contact with his ex-wife and WITNESS 1. ECF No. 53. Defendant has now been indicted with a federal crime punishable by a term of incarceration of up to twenty years. If anything, the factors that, according to the psychological assessment, "drove" Ilg to violence in first place are just as prevalent now as they were in March and April 2021, when the charged offense took place.

### B. Defendant Poses a Risk of Flight

As set forth herein and at the two prior detention hearings, Defendant has engaged in an escalating course of conduct, which culminated in his attempted suicide in April, almost immediately after his interview with FBI and shortly before his arrest on federal charges. Defendant's attempted suicide demonstrates the risk of his non-appearance. As the Tenth Circuit has explained, "Congress was certainly concerned with a defendant's risk of nonappearance" when it crafted the § 3142 factors. *United States v. Workman*, 680 F. App'x 699, 702 (10th Cir. 2017). "Though such a risk is normally conceived in terms of a defendant's willful flight of the charges against him, suicide is, technically speaking, one way that [a defendant] could not appear in court." *Id.*

While Defendant contends in his motion he currently is not a risk of flight, *see* ECF No. 63 at 12, the newly obtained forensic evaluation specifically notes that Defendant's "*long-term* risk for suicide was quite high," specifying that the "relative risk" of suicide could change "fairly quickly" *id.*, Ex. A at 6. The most recent assessment further notes that "access to firearms should . . . be removed to help reduce proximity to lethal means of suicide." *Id.* at 9. While Defendant contends that there is no risk of flight – i.e., by suicide – the physiological assessments on which Defendant relies suggest otherwise.

United States' Response to Defendant's Second Motion for Release - 13

Defendant cites to *United States v. Doane*, 54 M.J. 978, 982-83 (A.F. Ct. Crim. Appp. 2001), for the proposition that courts should "not put an accused in pretrial confinement *solely* to protect against the risk that an accused might kill himself." ECF No. 63 at 15 (emphasis added). In this case, however, the risk is not *solely* that Defendant "might kill himself," it is that Defendant, who already has attempted to kill himself once, also solicited violent acts directed at VICTIMS 1 and 2 while subject to a protective order. He perpetrated violence against WITNESS 1, including placing her into a hole in his backyard and sexually abusing her.

Unlike in *Doane*, the risks in this case extend far beyond the mere possibility – or as the latest psychological assessment, puts it, "quite high" risk – Defendant would again attempt to kill himself. As outlined here, Defendant is just as much a risk to others as he is to himself.

### C. Defendant Poses a Risk of Obstructing Justice

As set forth in the pleadings pertaining to Defendant's prior motion for release, which Judge Rodgers denied, Defendant has demonstrated an unhealthy obsession with WITNESS 1, continuing to seek her out, even while in custody. ECF No. 41 at 13. In fact, in jail calls, which were enclosed as part of the United States' pleadings, Defendant even asked third parties to contact WITNESS 1. *Id.*; *see also* Ex. C (recorded jail calls). As a result, in July 2021, the United States sought a no contact order, prohibiting Defendant from having any direct or indirect contact with WITNESS 1 or any of the VICTIMS in this case. *See* ECF No. 53.

After Judge Rodgers denied Defendant's most recent motion to reopen detention, Defendant sent a letter to WITNESS 1. *See* Ex. A. The letter reflects apparent efforts to obstruct justice – i.e., by soliciting WITNESS 1 to marry Defendant so she would not be compelled to testify against him and offering to pay the tuition for WITNESS 1's children to attend prestigious private schools in Spokane, Washington. *Id.* The letter,

United States' Response to Defendant's Second Motion for Release - 14

which was not touched upon in the psychological examinations procured by the defense, is set forth in relevant part below:

> We have a choice, [WITNESS 1], my [WITNESS 1], please join your first name with my last name. Let's build that family. I love you with every ounce of energy that God has blessed me with. I pray each night, [WITNESS 1], much like Jesus did in Gethsymane (spelling??). . . . Our union will be forever . . . . We will not need a prenuptial or postnuptial. We only need God's grace and love in our lives. . . .
>
> \* \* \* \* \*
>
> I know you are worried about cooperation + being truthful. I want you to be also. <u>Importantly, if we are married, we can decide if you testify or not. Washington law is unique in this way. One would think that you would have to testify regarding things that happened when we weren't married. That is not the case in Washington.</u>
>
> <u>I am taking a GIANT risk in sending you this letter, which I hope will find you. It could leave me here in this jail until trial.</u>
>
> \* \* \* \* \*
>
> <u>Please tell your lawyer that you want to us to be married as soon as possible. Today or tomorrow.</u> [My lawyer] will make it happen.
>
> If you are back with [your ex-husband] or hooked up with someone new, please text this to [my ex-wife][7]. The unknown is so much worse than the known. . . .
>
> If you want an amazing future with God leading the way, text [my ex-wife], "<u>Tell Ron/Sir, I will.</u>["]
>
> \* \* \* \* \*
>
> P.S. <u>If you love me now or ever loved me, please burn this letter + don't mention it to anyone. And if you want to build a family with me, I want to push forward + get [MINOR CHILD] in G PREP soon + [MINOR CHILD] at St. ALS, if that works for you.</u> I have so many plans for us.

Ex. A (emphasis added).

---

[7] Defendant was married prior to his relationship with VICTIM 2. The ex-wife referenced in the letter is not the same woman as VICTIM 2.

United States' Response to Defendant's Second Motion for Release - 15

The letter, which Defendant knew he should not send, is manipulative – relying on WITNESS 1's religious beliefs and faith to suggest that Defendant's relationship with the witness is preordained. The letter also demonstrates Defendant's misogynistic belief that WITNESS 1 is somehow subordinate to him – directing WITNESS 1 to refer to Ilg as "Sir" and inquiring into the witness's relationships with other men. *Id.* It reflects a continued obsessive need to control WITNESS 1 – even to the point of deciding whether she can testify against him or not and offering to pay thousands of dollars for WITNESS 1's children to attend private schools in Spokane. *See id.*

**5. Continued Detention Does Not Violate Due Process**

The Ninth Circuit has made clear "that at some point, pretrial detention can 'become excessively prolonged, and therefore punitive,' resulting in a due process violation. *United States v. Torres*, 995 F.3d 695, 708 (9th Cir. 2021) (quoting *United States v. Salerno*, 481 U.S. 739, 747 n.4 (1987). In considering whether a due process violation has occurred, courts must weigh the following factors: "(1) the length of the defendant's pretrial detention; (2) the prosecution's contribution to the delay; and (3) the evidence supporting detention under the Bail Reform Act." *Id.*

Defendant has been incarcerated for six months. ECF No. 63 at 17. Currently, trial is set for March 2021, less than one year from the time Defendant was placed in custody. *See United States v. Myers*, 930 F.3d 1113, 1119 (9th Cir. 2019) (explaining that "delays approaching one year are presumptively prejudicial" for Sixth Amendment purposes). While Defendant proffers in his motion that the case will not realistically proceed to trial until late 2022, it is premature to conclude that trial will be delayed until then. *See* ECF No. 63 at 17.

Turning to the second factor, if trial is prolonged until late 2022, it will not be as a result of some delay caused by the prosecution. To date, there have been two continuances at Defendant's request. *See* ECF No. 37, 58. At the outset of this case, no trials were being held as a result of the COVID-19 pandemic. Additionally, the United

United States' Response to Defendant's Second Motion for Release - 16

States has provided discovery on a rolling basis and discovery in this case is largely complete – though, like in all cases, additional materials almost certainly will be produced in the period leading up to trial – e.g., grand jury transcripts, 302s for witness interviews, future jail calls, finalized expert reports, etc. In any event, if trial is delayed until late 2022, Defendant will have been in custody for just eighteen months – a period below the twenty-one month detention that was upheld in *Torres*. *See* 995 F.3d at 710.

Finally, with respect to the third factor – the strength of the evidence – the evidence against Ilg is strong. The United States obtained Defendant's dark web messages directly from dark websites themselves. The password to those sites was on Defendant's phone, written down in a book, and inside a biometric safe in Defendant's bedroom. Text messages between Defendant and WITNESS 1 further corroborate Defendant's role in the offense, as does the specificity of the dark web messages – identifying his victims by name, workplace, work schedule, etc. Information that few, other than Defendant would know. Finally, Defendant's animosity toward his victims is the only apparent connection between VICTIMS 1 and 2. It would be a striking coincidence for someone else to target these two victims at the time a hitman was hired and paid to harm these victims.[8]

---

[8] Defendant's assertions that he should be released pending trial as a result of the COVID-19 pandemic are meritless. ECF No. 63 at 17. Currently, just .005% of the population at the Spokane County Jail has tested positive for COVID-19. https://www.spokanecounty.org/4972/Covid-Updates (4 of 794 inmates). Defendant faces no greater risk in custody than in the community. Significantly, the Spokane County jail has taken significant steps to mitigate the risks associated with COVID-19 and is operating under a modified operations plan. Since that the inception of the pandemic, the jail, as events require, has repeatedly revised its protocols and procedures to address the crisis. *Id.*

United States' Response to Defendant's Second Motion for Release - 17

## CONCLUSION

For the reasons set forth herein and at the initial detention hearing, this Court should deny Defendant's most recent motion for release. The Defense motion and the psychological assessment rely almost entirely on Defendant's own statements that he is no longer a risk of harming others or himself. Defendant's self-serving statements should provide the Court little, if any, comfort. Not only are these statements inconsistent with his recent behavior, many of Defendant's own statements belie his inability to comply with any conditions that might be set by this Court. His actions, including by sending a letter to a witness against him and proposing marriage so the witness would not have to testify against him and offering to pay for the witness's children to attend prestigious private schools, further demonstrate the continued detention is appropriate. In short, the allegations, evidence, and Defendant's history demonstrate that Ilg has violent tendencies that were exposed through his activities on the dark web when he encountered difficulties in his personal and professional life. While Defendant may present well during a psychological exam over Zoom, Defendant's psychological assessments demonstrate that even a small change in Defendant's circumstances have caused life-altering consequences for his victims.

DATED November 16, 2021

        Vanessa R. Waldref
        United States Attorney

        s/ *Richard R. Barker*
        Richard R. Barker
        Assistant United States Attorney

United States' Response to Defendant's Second Motion for Release - 18

## CERTIFICATE OF SERVICE

I hereby certify that on November 16, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System which will send notification of such filing to counsel of record.

<u>s/ Richard R. Barker</u>
Richard Barker
Assistant United States Attorney

United States' Response to Defendant's Second Motion for Release - 19