Vanessa R. Waldref
United States Attorney
Eastern District of Washington
Richard R. Barker
Assistant United States Attorney
Post Office Box 1494
Spokane, WA 99210-1494
Telephone: (509) 353-2767

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

| UNITED STATES OF AMERICA, | Case No. 2:21-CR-00049-WFN-1 |
|---|---|
| Plaintiff, | Response To Defendant's Motion to Dismiss Count Three of the Superseding Indictment |
| v. | |
| RONALD CRAIG ILG (a/k/a "SCAR215"), | |
| Defendant. | |

The United States of America, by and through United States Attorney Vanessa R. Waldref and Assistant United States Attorney Richard R. Barker, respectfully submits this Opposition to Defendant's Motion for Dismiss Count Three of the Superseding Indictment. *See* ECF No. 99.

In short, Defendant's motion is premature and fails to acknowledge the numerous substantial steps Defendant took toward kidnapping his intended victim. On similar facts and evidence, the Ninth Circuit and other courts, including the cases cited in Defendant's motion, have upheld charges similar to those in this case.

### STATEMENT OF FACTS

Defendant Ronald Craig Ilg (hereafter "Ilg" or "the Defendant") is charged with attempting to kidnap his estranged wife in early 2021. *See* ECF No. 80. Using

United States Response to Defendant's
Motion to Dismiss Count 3

1

the dark web moniker "Scar215," Defendant hired a dark web "hitman" to target his wife and one of Ilg's former colleagues.[1] *See* ECF No. 1. As part of the scheme, Ilg transferred more than $50,000 in Bitcoin to arrange for the hitmen to kidnap his estranged wife, extort her, and inject her with heroin. *Id.* In messages communicated through the dark web, Defendant identified the victim by name, address, work location, and outlined violent acts to be perpetrated against the victim, her father, and even the pet dog. *Id.* The Defendant went further, structuring a bonus scheme for paying a hitman, so long as certain goals were achieved:

> To earn the additional associated bonus, within 2 weeks of the target being released, she will have completed the specific goal.
> 1. Permanently withdraw all court motions and all mediated agreements. Bonus $10k
> 2. Return to your husband by asking to move back home AND fucking him at least three times within the 2 week time frame Bonus: $10k
> 3. Keep her mouth shut and tell no one, ever about the kidnapping Bonus $10k
> 4. Inject her daily with heroin and teach her to do it AND supply pics and videos of her injecting herself. $5k
> 5. Plant drugs and used needles with her DNA in the needles through her home. Provide some pics of drugs and needles scattered around $5k

*Id.* (emphasis added; grammatical and typographical errors in original). A complete transcript of the dark web messages related to the plot to kidnap Ilg's estranged wife is enclosed in Exhibits A, B, and C (dark web messages between purported hitmen and Defendant).

---

[1] Counts 1-2 of the Superseding Indictment allege Defendant paid for another hitman to physically assault another victim – Defendant's former colleague in his prior medical practice. *See* ECF No. 80. Specifically, Defendant requested a hitman from "Internet Killers," which offered a murder-for-hire service, to assault a former co-worker by beating her and breaking or injuring her hands. *See id.* Defendant has not challenged any counts relating to the former colleague in his motion.

United States Response to Defendant's
Motion to Dismiss Count 3

2

      The Federal Bureau of Investigation ("FBI") identified Defendant as Scar215 through various means. First, a locked biometric safe, which the FBI accessed via Ilg's fingerprint, was located during a search of Ilg's home. ECF No. 1 at ¶14. Inside, the FBI located a handwritten note with the username and a password for accessing the dark websites. *See id.* This same username and password also were located in pictures on Defendant's phone and inside a book in Ilg's luggage from a recent trip to Mexico. The FBI also obtained photographs of certain dark web addresses and bookmarks linking directly to a number of the dark websites Ilg used to hire and pay the hitmen. *See* Bates 40000012. Using the login credentials inside Ilg's safe, book, and electronic devices, the FBI recovered several of the actual dark web messages in which Defendant transacted for a hitman to kidnap, extort, and harm his estranged wife. *See* Ex. A–B.

      The FBI also identified the cryptocurrency transactions linking Defendant directly to the payments to the dark web hitmen. *See* ECF No. 1 ¶¶ 12-13. Several of the payments were sent from Defendant's Coinbase.com cryptocurrency account, which was registered using Defendant's name, date of birth, social security number, email address, and phone number. *Id.* The review of Ilg's cryptocurrency transactions further show Defendant purchased Bitcoin at ATMs in Spokane, Washington on various occasions in late March 2021 – just days before funding the account. A photograph of Defendant purchasing Bitcoin from the ATM is included below:

United States Response to Defendant's
Motion to Dismiss Count 3



Bates 60000052.29. When he deposited cash into the ATM, Defendant placed the Bitcoin directly into a cryptocurrency account or "wallet," which has a unique identifying address. *Id.* The Bitcoin was then transferred from this wallet directly to the dark web hitmen. *Id.* In other words, Defendant is captured on camera placing money into a unique wallet that was then used to make payments to the hitman sites.

During the investigation, Defendant also admitted to the FBI that he was Scar215. In a noncustodial and voluntary interview at the Spokane International Airport with the FBI, Defendant identified himself as "Scar2something." ECF No. 1 at ¶ 21. When the FBI confronted Ilg with the moniker "Scar215," Defendant did not deny it was him. Instead, he responded, "mm-hmm." *See* Bates 40000002 at 57:00 – 57:20 (Defendant's non-custodial interview). Additionally, in their search of Defendant's phone, the FBI recovered a word document, in which Defendant acknowledged using Bitcoin to pay hitmen on the dark web. In this document, which Defendant actually brought to the attention of the FBI during his interview and read out loud, Defendant stated he paid more than $40,000, including bonus

United States Response to Defendant's
Motion to Dismiss Count 3

4

payments, to a dark website identified as the "s c"[2] hitmen. *See* Ex. D. While Defendant denied participating in the kidnapping scheme, his claim that he paid thousands of dollars to have the hitmen kill him is not corroborated by any of the evidence in this case.

Additional facts and evidence pertaining to Defendant's conduct and how such conduct establishes a substantial step in furtherance of the kidnapping are included in the discussion below.

## DISCUSSION

Defendant's motion should be denied for two reasons: *First*, the motion is premature. Defendant is not entitled to a pretrial determination about the sufficiency of the evidence against him. The proper avenue for Defendant's challenge is through a Rule 29 motion *after* the presentation of the evidence in this case at trial. *Second*, the motion relates to a factual dispute that must be decided by the jury – i.e., whether Defendant in fact took a substantial step by soliciting a hitman, outlining a detailed plan for kidnapping his estranged wife, creating a bonus structure for payment, funding two escrow accounts to pay the hitman, and then directing the hitman to begin the job.

A. <u>The Instant Motion is Inappropriate under Fed. R. Crim. P. 12(b)</u>

A defendant "may not properly challenge an indictment, sufficient on its face, on the ground that the allegations are not supported by adequate evidence." *United States v. Jensen*, 93 F.3d 667, 669 (9th Cir. 1996) (quoting *United States v. Mann*, 517 F.2d 259, 267 (5th Cir. 1975)). "[A] Rule 12(b) motion to dismiss is not the

---

[2] "S C" appears to be a reference to the Sinaloa Cartel, which is purportedly associated with the dark website Defendant used to hire a hitman to kidnap his estranged wife. *See* Ex. A. In his non-custodial interview, Defendant claimed this was a reference to the Sandinista Cartel; however, the FBI agents assigned to this case are not aware of any Sandinista Cartel, let alone the presence of such a cartel in Eastern Washington.

United States Response to Defendant's
Motion to Dismiss Count 3

5

proper way to raise a factual defense." *United States v. Nukida*, 8 F.3d 665, 669 (9th Cir. 1993) (citations omitted). "The proper procedure for raising [a] challenge to the sufficiency of the government's evidence to support a finding [of an element of the offense is] by a motion for judgment of acquittal under Rule 29 and not by a pretrial motion to dismiss." *Id.* at 670 (quotation omitted).[3] "There is no summary judgment procedure in criminal cases. Nor do the rules provide for a pre-trial determination of sufficiency of the evidence." *United States v. Salman*, 378 F.3d 1266, 1268 (11th Cir. 2004) (internal quotes omitted). Instead, "[a] motion for acquittal under Rule 29 is the proper avenue for contesting the sufficiency of the evidence in criminal cases." *Id*.

Rule 12(b) of the Federal Rules of Criminal Procedure permits consideration of any defense "which is capable of determination without the trial of the general issue." A motion to dismiss is generally capable of determination before trial if it involves questions of law rather than fact. *Nukida*, 8 F.3d at 669. Although the Court may make preliminary findings of fact necessary to decide the legal questions presented by the motion, the Court may not invade the province of the ultimate finder of fact. *Id.*; *see also United States v. DeLaurentis*, 230 F.3d 659, 660–61 (3d Cir. 2000) ("[A] pretrial motion to dismiss an indictment is not a permissible vehicle for addressing the sufficiency of the government's evidence."). For example, a Rule 12 motion is appropriate when predicated on evidence relating to segregable matters such as lack of jurisdiction, double jeopardy, any former convictions or acquittals,

---

[3] In *Nukida*, the defendant filed a Rule 12(b) motion seeking dismissal of the indictment on the grounds that the district court lacked subject matter jurisdiction over the case, because her acts did not affect interstate commerce. 8 F.3d 665 (9th Cir. 1993). While the district court dismissed the tampering counts, the Ninth Circuit reversed, finding that Defendant's "motion to dismiss amounted to a premature challenge to the sufficiency of the government's evidence tending to prove a material element of the offense defined by" statute. *Id.* at 669–70.

United States Response to Defendant's
Motion to Dismiss Count 3

6

the applicable statute of limitations, or immunity. *Nukida*, 8 F.3d at 669. However, "[i]f the pretrial claim is substantially founded upon and intertwined with evidence concerning the alleged offense, the motion falls within the province of the ultimate finder of fact and must be deferred." *United States v. Shortt Accountancy Corp.*, 785 F.2d 1448, 1452 (9th Cir. 1986).

Here, Defendant is asking the Court to decide an issue involving an element of the charged offense before the trial has even begun – i.e., whether Defendant took a substantial step toward kidnapping his estranged wife when he directed a hitman to kidnap the victim, provided detailed instructions for the kidnapping, communicated a detailed bonus structure, paid more than $50,000 to a third-party escrow service, and directed the hitman to start the job immediately. This is a question the jury will have to determine. As in *Nukida*, the proper vehicle for a challenge to the sufficiency of the evidence is not a pretrial motion to dismiss, but a Rule 29 motion at trial. Again, a Rule 12(b) motion is an inappropriate vehicle when it hinges on a factual determination – i.e., whether Defendant's actions in part or in whole constitute a substantial step.

B. <u>Defendant Took a Substantial Step Toward Kidnapping his Estranged Wife.</u>

1. <u>Legal Standard for Attempted Kidnapping</u>

To commit a kidnapping under 18 U.S.C. § 1201(a)(1), a defendant must seize, confine, kidnap, or carry away an individual, while using instrumentalities of interstate or foreign commerce. *See* 18 U.S.C. § 1201(a)(1). For an attempted kidnapping, a defendant must (1) intend to kidnap the victim; and (2) take a substantial step toward completing the violation. *Cf United States v. Snell*, 627 F.2d 186, 187 (9th Cir. 1980) ("A conviction for attempt requires proof of culpable intent and conduct constituting a substantial step toward commission of the crime that strongly corroborates that intent.").

United States Response to Defendant's
Motion to Dismiss Count 3

7

A substantial step is one that advances the criminal purpose charged and provides some verification of the existence of that purpose. *United States v. Goetzke*, 494 F.3d 1231, 1235-36 (9th Cir. 2007). Courts put it like this:

> A substantial step must be something more than mere preparation, yet may be less than the last act necessary before the actual commission of the substantive crime . . . In order for behavior to be punishable as an attempt, it need not be incompatible with innocence, yet it must be necessary to the consummation of the crime and be of such nature that a reasonable observer, viewing it in context could conclude beyond a reasonable doubt that it was undertaken in accordance with a design to violate the statute.

*United States v. Manley*, 632 F.2d 978, 987-88 (2d Cir.1980), *cert. denied,* 449 U.S. 1112 (1981). Ultimately, the line between preparation and a substantial step and is not always clear; it entails a fact-intensive inquiry befitting a petite jury. *United States v. Neal*, 78 F.3d 901, 906 (4th Cir. 1996) ("Whether conduct represents substantial step, as required for attempt offense, depends on 'surrounding factual circumstances' and, therefore, such determinations are necessarily fact specific.").

In kidnapping cases, courts routinely have held that actions that go beyond mere planning are sufficient to establish a substantial step toward the commission of the crime. For instance, outlining logistics of the kidnapping scheme and approving the tools to be used constitute a substantial step. *See United States v. Sanchez*, 615 F.3d 839, 844 (7th Cir. 2010) (selecting the van and visiting the safehouse for the kidnapping constituted a substantial step in kidnapping). Similarly, when a defendant's actions are so near to the commission that a crime becomes probable, then that action is a substantial step. *See e.g.*, *United States v. Coplon*, 185 F.2d 629, 633 (2d Cir. 1950) ("some preparations may amount to an attempt. It is a question of degree.").

Where a suspect hires someone to commit the desired crime, the Ninth Circuit has held that soliciting a purported hitman, providing the hitman with the victim's

United States Response to Defendant's
Motion to Dismiss Count 3

address and personal information, setting payment terms, and making a partial payment constitute a "substantial step" toward carrying out the intended crime. *See United States v. Temkin*, 797 F.3d 682, 687, 690, (9th Cir. 2015). Courts have taken this a step further, explaining that the act of "soliciting another person to engage in criminal conduct can satisfy the substantial step requirement for an attempt." *See e.g.*, *United States v. Cornelio–Pena*, 435 F.3d 1279, 1287 (10th Cir. 2006); *United States v. Am. Airlines, Inc.*, 743 F.2d 1114, 1120, 1121 & n. 13 (5th Cir. 1984) (collecting cases where solicitation can constitute an attempt, and noting that "several federal courts have concluded that a solicitation accompanied by the requisite intent may constitute an attempt").

        2.  <u>The Evidence Is Sufficient to Demonstrate a Substantial Step</u>

Defendant did not merely talk about kidnapping the victim or make preparations for doing so. He did not simply provide her address, describe members of her family, disclose her work schedule, or discuss logistics. Rather, he engaged two separate dark web vendors for purposes of hiring a hitman, and paid more than $50,000 to put the kidnapping into motion. On this record, a rational jury could conclude that Defendant would have followed through with his plans. In fact, in two separate messages, the administrator for the websites confirmed to Defendant that everything was in place to get started with the plan to kidnap Ilg's estranged wife. After receiving confirmation, Defendant directed the dark web operators to go ahead and get started "this weekend." Ex. A at 11. These "actions constitute[] 'a substantial step,' as a reasonable observer could conclude beyond a reasonable doubt that [Ilg] gave [the hitmen] all that was necessary to provide [them] with the means" of kidnapping Ilg's estranged wife in violation of 18 U.S.C. 1201(d). *See Tempkin*, 797 F.3d at 690.

As detailed below, Defendant's actions and messages through the dark web demonstrate a number of substantial steps Defendant took through his

United States Response to Defendant's
Motion to Dismiss Count 3

9

communications and payments to a least two dark web sites: "Internet Killers" and the *"Sinaloa Cartel."*

*Internet Killers*: Between February 23, 2021 and March 30, 2021, Defendant paid for a hitman from the dark web site "Internet Killers" to kidnap his then estranged wife. Specifically, Defendant placed an "order" on the site describing his target by name and address. He also made payments so his estranged wife would be "held," for seven days, "given injections of heroin at least two times per day," and instructed to inject "herself." Ex. B at 1. He further directed that his estranged wife be video recorded while injecting herself with heroin. *Id.* Defendant then articulated a clear timeline – for the kidnapping to be completed within two weeks. *Id.*

*Sinaloa Website*: Beginning on March 29, 2021, Defendant submitted a separate request through a second dark website. This site purported to be associated with the Sinaloa Cartel. Ex. A at 1. Similar to his first request, Defendant directed that his estranged wife be held for seven days, injected with heroin, and taught to do it herself. *Id.* He also directed that the kidnapping needed to be done around April 9 to April 18. *Id.* As noted above, he structured a bonus to be paid upon completion of the job. *Id.* The kidnapping plot even involved a third-party escrow service to hold Defendant's payment until the kidnapping job was complete. *See id.* at 6. In all, Defendant transferred approximately $50,000 dollars to the escrow service to fund the kidnapping. *See* Bates at 60000052. He also sent at least twenty separate messages to the administrators of the dark website specifying in detail the means of the kidnapping, ideas to threaten his victim, and negotiated payment and a bonus structure. *See generally* Ex. A.

The messages also demonstrate that Defendant believed everything was in place for the kidnapping to go forward. On April 1, 2021, Defendant transferred approximately 0.664 Bitcoin to the Sinaloa site. After the transfer Defendant asked, "Would you agree that there is sufficient funds now to proceed?" *Id.* at 7. That same

United States Response to Defendant's
Motion to Dismiss Count 3

10

day, the administrator of the dark website responded, "Yes, I agree it is enough to proceed," specifying that the hitman would "follow . . . directions as exactly specified by you, and the goals will be filled exactly as you requested. I will keep you updated soon." *Id.* at 8.

Then, after an apparent glitch with the escrow account,[4] Defendant started funding a new escrow and again confirmed his belief that everything was in place to effectuate the plot. Ex. A at 11-12. On April 6, 2021, Defendant emphasized that "the timing is an issue" and added, "the bonus may be affected if we wait too long." *Id.* Defendant then asked, whether the hitman will "start this weekend?" *Id.* at 11. To this, the administrator for the dark website responded that if Ilg added $5,000 to the escrow, the hitman would get started. *Id.* at 12. Ilg did just that, writing on April 8, 2021, that the new escrow was started and asking for "pics and videos." *Id.* Defendant also directed, "please have your man begin this weekend." *Id.* This was the last message Defendant sent to the purported hitmen.[5]

In sum, Defendant directed a detailed kidnapping plot: identifying the victim by name, supplying her address, specifying methods for extorting the victim, articulating a bonus scheme for paying the hitman, placing approximately $40,000

---

[4] Defendant's messages with the Escrow Service are enclosed in Exhibit C. In short, Ilg sent 0.664 Bitcoin – nearly $40,000 at the time – to an initial escrow account. In messages with the escrow service, Defendant also identified the scheme for paying out the bonus to the hitman. In doing so, however, Defendant specified the incorrect address for the payment. Ex. C at 1. Although Defendant sought to change the payment address, the escrow service was unable to do so. Defendant then canceled the transaction and started a new escrow. *See* Ex. A at 11-12.

[5] Around this time, the phone Defendant used to communicate with the dark websites was thrown into a pool, which explains why Ilg did not send additional communications with the operators of the Sinaloa site. According to Defendant and other witnesses, Defendant had a specific burner phone in which his username and password to the Sinaloa site was saved and stored.

United States Response to Defendant's
Motion to Dismiss Count 3

11

in an initial escrow account, and funding a second escrow account up to approximately $10,000. As in *Tempkin*, Defendant solicited a purported hitman, provided the hitman with the victim's address and personal information, set payment terms, and made payments to put the plot into motion. *See* 797 F.3d at 690. These actions constitutes a "substantial step" toward carrying out the kidnapping plan. *Id.* These actions further reflect that Defendant believed "the crime w[ould] take place unless interrupted by independent circumstances."[6] *See United States v. Nelson*, 66 F.3d 1036, 1042 (9th 1995). Defendant took numerous steps or actions of "such substantiality that, unless frustrated, the crime would have occurred." *Id.*

       3.  <u>Defendant's Cases and Additional Arguments are Not Persuasive</u>

In his motion, Defendant cites to five solicitation cases, which, according to Defendant, demonstrate as a *matter of law* that a substantial step is lacking in case. ECF No. 99 at 11 – 13. Defendant's cases, however, actually demonstrate the opposite – that Defendant took actions beyond what was found to be sufficient in each of the cases Defendant cites. As reflected in the chart below, the evidence in this case matched the evidence that courts have deemed sufficient to establish a substantial step in the context of soliciting a crime of violence.

---

[6] The independent, intervening circumstances in this case are two-fold. First, a few days after the dark website operators and Defendant came to terms, the dark website operators insisted upon additional payments. *See* Ex. A at 13. Second, the plot was interrupted when the FBI intervened on April 11, 2021, and Defendant admitted to soliciting hitmen on the dark web.

United States Response to Defendant's
Motion to Dismiss Count 3

|  | *U.S. v. Temkin,* 797 F.3d 682, (9th Cir. 2015) | *U.S. v. Irving,* 665 F.3d 1184 (10th Cir. 2011) | *People v. Voit,* 825 N.E.2d 273 (Il. Ct. App. 2004) | *State v. Daniel B,* 201 A.3d 989 (Conn. 2019) | *Martin-Argaw v. Georgia* 806 S.E.2d 247 (Ga. 2017) | *U.S. v. Ilg* |
|---|---|---|---|---|---|---|
| **Solicitation** | Suspect met with the purported hitman in person. *Id.* at 687. | Suspect solicited hitman through a third-party. *Id.* at 1190. Suspect never met the primary hitman. *Id.* at 1198. | Suspect met in person with the purported hitman. *Id.* at 280. | Suspect solicited a hitman through phone calls and texts with a third party and arranged to meet the hitman in person. *Id.* at 1003. | Suspect solicited a purported hitman over the phone and later met with the person at home. *Id.* at 250. | Ilg sent 20 messages directing a dark web hitman to kidnap his estranged wife. |
| **Identifying Information** | Suspect provided the hitman with the victim's address and personal information. *Id.* | Suspect identified victim by name at a party and offered money for the hit. *Id.* | Suspect identified victim by name, provided a photo, and gave purported hitman the victim's car key. *Id.* | Suspect provided victim's name, home address, employer, work address, and work schedule. *Id.* at 1003. | Suspect gave the hitman identifying information for three targets. *Id.* | Ilg provided victim's name, address, workplace, work schedule, and info about the victim's family and pet. |
| **Specificity** | Suspect directed hitman to force victim to pay $15 million to the suspect and to send victim on a "very long boat ride" *Id.* | Killing was to take place in Muskogee, Oklahoma by means of a firearm. *Id.* | Suspect stated merely that she wanted the "misery ended." *Id.* No details for how the victim would be attacked. | Suspect planned to apprehend the victim during a fake carjacking in a rough neighborhood. *Id.* | Suspect directed that he wanted all three targets to be killed. *Id.* | Ilg directed victim to be kidnapped, extorted, injected with drugs, photographed, videotaped, etc. |
| **Payment** | Suspect paid hitman $3,000 to cover initial expenses, noting, "that's all that I can move." *Id.* | Parties agreed to half of the $50,0000 payment up front, but no money changed hands. *Id.* at 1198 | Suspect made initial deposit ($600) and discussed further payments up to $7,000. *Id.* at 279 – 280. | Suspect created a structured payment scheme with the initial payment due in 10 hours. *Id.* at 1003. | Suspect agreed to pay negotiated price and discussed logistics of making the payment. *Id.* No payment was made. *Id.* | Ilg and the purported hitman negotiated a set price and Ilg deposited more than $50,000 into two escrow accounts as payment. |
| **Certainty** | Suspect stated he understood when hitman said, "I walk out of here, the job is done." *Id.* | Suspect told third-party to proceed with the plan – "shit, come on!" *Id.* at 1191. | Purported hitman confirmed that the suspect wanted the job done. *Id.* at 279 | Suspect "made up his mind' that he was going" to commit the offense. *Id.* at 1001 | Suspect directed hitman to proceed with the hit. *Id.* | Operator of dark website said he would get started when Ilg added an additional $5,000 to escrow. Ilg added the money. |

United States Response to Defendant's
Motion to Dismiss Count 3

13

According to Defendant, no substantial step is possible in this case because Ilg never met in person with the hitmen and because payment, according to Defendant, was not made in full. ECF No. 99 at 12. Defendant cites no cases requiring that a suspect meet or speak directly with the purported hitman or for payment to be complete. In fact, in, *Irving*, one of the cases on which Defendant relies for this novel proposition, the suspect never met with or spoke with the primary hitman and "no money exchanged hands." 665 F.3d at 1197. The evidence here is even stronger than in *Irving* – Ilg solicited a dark web hitman, sent more than twenty messages to the hitman detailing the plot, and set a fixed price, complete with a bonus structure. *See* Ex. A. Unlike in *Irving*, Defendant also funded the operation – transferring more than $50,000 for the illicit services. Finally, like in *Irving*, Defendant confirmed everything was in place for the job to get started. *See* Ex. A at 11 (confirming the hit would take place "this weekend"). While Defendant did not meet in person with the hitman, Defendant's efforts to remain anonymous and hire a hitman over the dark web do not absolve him from the substantial steps Defendant took to kidnap his estranged wife.

To the extent Defendant alludes to a message from the escrow service indicating that the initial transaction was being "canceled," ECF No. 99 at 12-13, Defendant was not seeking to withdraw from or abandon the kidnapping plot. Rather, Defendant began funding a new escrow shortly after identifying a hiccup with the initial escrow account. Ex. A at 12-13. He did nothing whatsoever to suggest that he was abandoning the attempted kidnapping. Regardless, even if such evidence could be construed to mean that Defendant was attempting abandon the kidnapping plot, abandonment is not a defense to an attempted kidnapping. *See United States v. Tilotta*, – F.Supp.3d –, 2022 WL 623915, at *5 (S.D. Cal. 2022) ("[T]here is no affirmative defense of abandonment available to a defendant charged with an attempt offense."); *see also United States v. Temkin*, 797 F.3d 682, 690 (9th Cir.

United States Response to Defendant's
Motion to Dismiss Count 3

14

2015 ("[A]bandonment is not a defense when an attempt, as here, 'has proceeded well beyond preparation.'"); *United States v. Young*, 613 F.3d 735, 745 (8th Cir. 2010) ("[A] defendant cannot abandon an attempt once it has been completed.").

### CONCLUSION

The government's obligation at trial will be to prove beyond a reasonable doubt Defendant intended to violate 18 U.S.C. § 1201. Whether the United States has reached its burden must be addressed after the presentation of the evidence at trial. That said, the anticipated evidence is more than sufficient to for a reasonable factfinder to determine beyond a reasonable doubt that Defendant attempted to have his estranged wife kidnapped by dark web hitmen.

Dated: May 19, 2022

Vanessa R. Waldref
United States Attorney

*/s/ Richard R. Barker*
Richard R. Barker
Assistant United States Attorney

### CERTIFICATE OF SERVICE

I hereby certify that on May 19, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System which will send notification of such filing to the following: Carl Oreskovich

*/s/ Richard R. Barker*
Richard R. Barker
Assistant United States Attorney

United States Response to Defendant's
Motion to Dismiss Count 3

15