Vanessa R. Waldref
United States Attorney
Eastern District of Washington
Richard R. Barker
Assistant United States Attorney
Post Office Box 1494
Spokane, WA 99210-1494
Telephone: (509) 353-2767

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

UNITED STATES OF AMERICA,

Plaintiff,

v.

RONALD CRAIG ILG,

Defendant.

2:21-CR-00049-WFN-1

United States' Response to
Defendant's Motion to Suppress
Statements

The United States of America, by and through United States Attorney Vanessa R. Waldref and Assistant United States Attorney Richard R. Barker, submits this Response to Defendant's Motion to Suppress Statements. *See* ECF No. 95. As set forth herein, Defendant's motion to suppress his voluntary, non-custodial interview should be denied.

## INTRODUCTION

Defendant's motion to suppress his voluntary statements turns on one issue – whether he was in custody when law enforcement met him at the airport, politely asked to speak with him, and Defendant agreed. During the ensuing conversation, Defendant was asked about the crimes with which he is now charged, and Defendant denied soliciting a hitman on the so called "dark web" to assault a former work colleague and kidnap Defendant's estranged wife.  Defendant was told he was not under arrest and that he was free to leave at any point. Rather than walk out of the interview, Defendant

volunteered that he had been on the dark web to hire a hitman. Defendant also volunteered that he paid approximately $50,000 for the hitmen, who according to Defendant, were supposed to kill Defendant. The FBI asked Defendant about the inconsistencies in his story, but Defendant again denied hiring anyone to hurt the former colleague or Defendant's wife. At one point in the interview, the FBI agents indicated they had a search warrant for Defendant's phone and luggage, and again told Defendant he could leave his phone and be on his way. Instead, Defendant decided to stay and reengaged in a conversation with the FBI.

As set forth herein, the totality of the circumstances establish Defendant was not in custody during the voluntary interview. *See United States v. Mendenhall*, 446 U.S. 544 (1980) (finding a traveler suspected of possession of narcotics and who was detained in an airport conference room was not seized by law enforcement); *see also United States v. Bassignani*, 575 F.3d 879, 884 (9th Cir. 2009) ("Where we have found an interrogation non-custodial, we have emphasized that the defendant 'agreed to accompany' officers to the police station or to an interrogation room.").

Because the interview was not custodial, the FBI was not required to terminate the interview when Defendant made statements about wanting a lawyer, but then nonetheless voluntarily reinitiated conversation and proceeded to tell his story about hiring a dark web hitman to commit suicide. *See United States v. Hines*, 963 F.2d 255, 256 (9th Cir. 1992) (holding that a request for a lawyer during a non-custodial interview cannot be considered an invocation of Miranda rights).

## BACKGROUND

A. Charges and Evidence against Defendant

In early 2021, Defendant attempted to hire hitmen on the dark web to harm a former work colleague and to kidnap Defendant's estranged wife. ECF No. 98-1 at 15. As part of this plan, Defendant used the moniker "Scar215" to conceal his identity and paid more than $50,000 in bitcoin to advance the two schemes. *Id.*

To further the plan to have his estranged wife kidnapped, Defendant came up with a bonus structure if certain "goals" were achieved. These goals included compelling his wife to withdraw from court proceedings and return to her husband and have sex with him three times in the first two weeks back. *Id*. at 20. To get the victim to do this, Defendant directed the hitman to threaten the victim's older child, her father, and the family dog. *Id*. at 22.

After learning of the Defendant's criminal scheme and his threats to these victims, the FBI applied for and obtained search warrants for Defendant's person, his cell phone, luggage, and his home in Spokane, Washington. *See* ECF No. 1. On April 11, 2021, the FBI traveled to the Spokane International Airport in efforts to speak with Defendant, who was on a return flight to Spokane from Mexico, where Defendant had been vacationing. *Id.* Conveniently for him, Defendant had arranged to be out of the country the very weekend he wanted his estranged wife-kidnapped. *See id.* at ¶10.

B. April 11, 2021 Interview of Defendant

At approximately 5:00 p.m., on April 11, 2021, Defendant and his travel companions returned to the Spokane International Airport, arriving on an Alaska Airlines flight, which taxied to Concourse C.[1] As Defendant, his girlfriend at the time, and her children exited the aircraft and walked toward the baggage claim area, FBI Special Agent Parker approached Defendant, introduced himself, and asked if he would be willing to speak with the FBI. As the following exchange demonstrates, Defendant voluntarily agreed to speak with the FBI in an airport conference room that was just off of the main hallway leading to baggage claim:

| SA Parker: | Excuse me, sir?  Dr. Ilg? |
| Defendant: | Yeah. |

---

[1] Defendant mistakenly states in his declaration that his return trip was a Southwest Airlines flight arriving in Concourse A, travel records indicate that Defendant is mistaken. *See* ECF No. 96 at ¶ 3. At a hearing on the motion, the United States would anticipate introducing evidence and testimony that it was an Alaska Airlines flight.

| SA Parker: | Can I speak with you for a minute?  My name is Special Agent Parker with the FBI. |
| --- | --- |
| Defendant: | Okay. |
| | [Speaking to M.P.] You guys go ahead. |
| SA Parker: | Could we visit with you in here? |
| Defendant: | Sure. |
| SA Parker: | Come on in here, if you would. |

Ex. A at 3 (corrected transcript of Defendant's interview) [2]; Ex. B at 10:19-10:48 (Audio recording of Defendant's interview).

From the main hallway, the FBI and Defendant walked through a small vestibule, and into a medium-sized conference room with large windows. The map below depicts the path from where the FBI first encountered Defendant (denoted by the red circle) to the conference room (denoted by the red X), where Defendant agreed to speak with the FBI. *See also* Ex. D (video showing the route to the conference room).



_____

[2] For reasons unknown to the government, Defendant's transcript of the interview, which was submitted with his brief, does not include the portion of the interview in which the FBI asked Defendant whether they would speak with him. *See* ECF No. 98 at Ex. C. The United States has corrected these omissions, among several others, which are reflected in red text in Exhibit A.

Based on the recording of Defendant's voluntary interview with the FBI, it took about seven seconds to walk from the airport hallway into the conference space, where Defendant took a seat across from two FBI agents – Special Agents Christian Parker and Eric Barker.  Nothing obstructed Defendant's path from the conference room to the exit. *See* Ex. C (photographs of the interview space). Additionally, none of the doors leading from the conference room back into the main hallway were locked. Defendant was free to get up and leave at any time. He even suggested taking an Uber home and directed his traveling companions to leave without him. Ex. A at 4.

During the interview, the FBI asked some background questions, which led into a question about whether Defendant transacted in Bitcoin. Ex. A at 17. At this point, Defendant asked whether he should have an attorney. Defendant and the FBI agents then engaged in the following back in forth, which is set forth in full in Exhibit A and in the Argument section below:

| | |
|---|---|
| Defendant: | Before I go, should I have a lawyer? |
| SA Barker: | That's always up to you. That's your call. |
| SA Parker: | Yeah. You're here of your own will. |
| Defendant: | Yeah. |
| SA Parker: | If you ever want to get up and walk out, you're free to do that. But I – you know, we can't give legal advice. |

* * * * *

| | |
|---|---|
| Defendant: | So, I prefer that, at this point, is to have a lawyer.  Not because I have anything to hide. |

* * * * *

| | |
|---|---|
| SA Parker: | With that, we do have a warrant for your personal device. |

* * * * *

| | |
|---|---|
| SA Parker: | If you are – if you are interested, as I mentioned, we have a warrant for digital items in general, but specifically, for a phone. |

| | | |
|---|---|---|
| 1 | | If you would like us to forensically image that for right now |
| 2 | | and have you wait, when we're done, you can take it with you. Or we can take it and you can be on your way. |
| 3 | Defendant: | Umm. Boy. It's my only means of communication is why |
| 4 | | I'm hesitating. |
| 5 | SA Parker: | Oh, I know. Without that phone, none of us can function. |
| 6 | Defendant: | Right. Why don't you guys do that, do the digital imaging while I wait. |
| 7 | SA Parker: | Okay. |
| 8 | Defendant | That way, I have my phone. |
| 9 | SA Parker: | Okay. |
| 10 | | And there is the caveat that if something goes wrong and |
| 11 | | we're not able to do it, for some technical glitch or reason, then we would need to send it off to a lab. Just kind of -- |
| 12 | Defendant: | Okay. |
| 13 | SA Parker: | -- in full disclosure. |
| 14 | Defendant: | No, no. That's fine. |
| 15 | SA Parker: | We'll do what we can. We're gonna be completely honest |
| 16 | | with you. We're not here to yank you around. |
| 17 | Defendant: | Okay. No, that's fine. *There's one thing that I will share with* |
| 18 | | *you, since I don't have my lawyer. But I did put it on here. I will just read it to you, because you are going to see it* |
| 19 | | *anyway.* |

20  Ex. A at 17-20 (emphasis added); Ex. B at 24:45-27:52. At this point, Defendant began

21  a lengthy narrative in which he read a document saved on his phone. Ex. A at 20 - 38.

22  The narrative described Defendant's dark web activities – which the FBI had never

23  brought up – and explained Defendant had been trying to locate a hitman on the dark

24  web as a way to commit suicide. *Id.* Shortly after this, Defendant stated he was willing

25  to talk about his activities on the dark web without a lawyer present *Id.* at 20. As

26  Defendant's narrative progressed, the FBI asked some follow up questions and

27  challenged certain of Defendant's factual assertions. *See generally id.* Additional details

28  and excerpts from the interview are described in the Argument below.

United States' Response to Defendant's Motion to Suppress Statements - 6

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**ARGUMENT**

Defendant's motion to suppress his statements turns entirely on whether Defendant was in custody for purposes of Miranda when he voluntary agreed to speak with the FBI on April 11, 2022 in an airport conference room and volunteered information about his activities on the dark web *immediately* after the FBI told him he was not under arrest and free to leave. Because Defendant was not in custody, he was not entitled to Miranda warnings and the FBI was not required to terminate the interview when Defendant asked about getting a lawyer. Accordingly, Defendant's voluntary statements to law enforcement and any derivative evidence obtained based on the interview should not be suppressed.

**A. Defendant Was Not in Custody for Purposes of *Miranda*.**

The Fifth Amendment privilege against self-incrimination requires that a person be advised of certain rights if they are "in custody" and "subjected to interrogation." *Miranda v. Arizona*, 384 U.S. 436, 467-68 (1966). When the government does not advise a person of his or her Miranda rights, any statements made by that person during a *custodial* interrogation are inadmissible. *Id.* When a person is not in custody, law enforcement is free to engage in "questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process" without implicating the Fifth Amendment. *Id.* at 477. Here, neither party disputes that the FBI asked Defendant a number of questions during an FBI interview. The only question is whether Defendant was in custody, requiring the FBI to advise Defendant of his Miranda rights.[3]

The Supreme Court has held that the question of custody requires courts to determine "whether there [was] a formal arrest or restraint on freedom of movement of

---

[3] Although the FBI did not affirmatively advise Defendant of the rights afforded pursuant to *Miranda v. Arizona*, Defendant apparently understood these rights – pausing the interview and asking whether he should have a lawyer and then continuing, "So, I prefer that, at this point, is to have a lawyer present." Moments later, after the FBI affirmed Defendant was free to leave, Defendant divulged that he paid bitcoin to certain dark web hitmen. Ex. A at 25.

United States' Response to Defendant's Motion to Suppress Statements - 7

the degree associated with a formal arrest." *Stansbury v. California*, 511 U.S. 318, 322 (1994). The focus of this inquiry is whether a "reasonable innocent person in such circumstances would conclude that after brief questioning, he or she would not be free to leave." *United States v. Cazares*, 788 F.3d 956, 980 (9th Cir. 2015). Generally, a reasonable innocent person would not feel free to leave if "something [is] said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates that they would not have heeded a request to depart or to allow the suspect to do so." *United States v. Hall*, 421 F.2d 540, 545 (2d Cir. 1969). Whether an individual is in custody is a fact-intensive inquiry requiring the court to look at the totality of the circumstances. *United States v. Craighead*, 539 F.3d 1073, 1082 (9th Cir. 2008).

In deciding the question of a custodial seizure, the United States Supreme Court's decision in *United States v. Mendenhall* is instructive. *See* 446 U.S. 544 (1980). In *Mendenhall*, two federal agents approached the defendant in an airport, suspecting that she had engaged in narcotics trafficking. *Id.* at 547-48. Just like in this case, the agents introduced themselves as federal agents and asked if she would accompany the agents to an office in the airport. *Id.* at 548. She agreed to do so. *Id.* The officers did not make any threats or show of force. *Id.* Even though the defendant in Mendenhall was a 22-year-old without even a high school diploma – a stark contrast to a 55-year old neonatologist with a graduate level education like Defendant – the Supreme Court ruled that Mendenhall had not even been seized by law enforcement, let alone restrained to the degree associated with an arrest:

> A person is seized only when, by means of physical force or show of authority his freedom of movement is restrained . . . As long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy" that would require a justification under the Constitution.

*Id.* at 553-54.

Consistent with *Mendenhall*, the Ninth Circuit has identified a non-exhaustive list of factors that are particularly relevant to the custody inquiry: "(1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual." *United States v. Kim*, 292 F.3d 969, 973 (9th Cir. 2002). Other factors may also be "pertinent to, and even dispositive of, the ultimate determination whether a reasonable person would have believed he could freely walk away from the interrogators." *Id.*

Turning again to this case, the Court should follow *Mendenhall* and its progeny and find Defendant was not in custody when he agreed to speak with the FBI and made incriminating statements about his activities on the dark web. As detailed herein, a reasonable person in Defendant's position would have felt free to terminate the interview and leave. In fact, Defendant ultimately did just that – returning to his home after the interview.[4] Additionally, for the reasons explained below, analysis of the five factors set forth in *Kim* demonstrates Defendant that was not in custody at the time of his interview with FBI.

---

[4] In his briefing, Defendant does not address *Mendenhall*, but he does cite to a number of other cases involving interviews at an airport, which, according to Defendant, establish he was in custody in this case. ECF No. 95 at 14. Defendant's cases – *Carr*, *Griffin*, and *Hartwell*, are readily distinguishable from the interview at issue here. In *United States v. Carr*, for example, four officers handcuffed defendant and held him down by his triceps and wrist after police discovered a mass consistent with heroin in his luggage. *See* 63 F.Supp.3d 226, 336 (E.D.N.Y. 2014). In *United States v. Griffin*, police affirmatively separated the suspect from her traveling companions and never told her she could terminate the interview or leave the interview room. 7 F.3d 1512, 1519 (10th Cir. 1993). Finally, in *United States v. Hartwell*, the Court found a traveler to be in custody after the traveler produced a suspicious item he had been reluctant to reveal and was then directed into a small private room, surrounded by agents and an officer, who blocked the exit. *See* 296 F. Supp.2d 596, 606-607 (E.D.P.A. 2003). The instant case is nothing like the ones on which Defendant now relies.

(1) <u>The Language Used to Summon Defendant</u>

The first factor directs the Court to consider the language used to summon Defendant. When a defendant voluntarily consents to speak with police, such a circumstance suggests that the interrogation was non-custodial. *United States v. Bassignani*, 575 F.3d 879, 884 (9th Cir. 2009) ("Where we have found an interrogation non-custodial, we have emphasized that the defendant 'agreed to accompany' officers to the police station or to an interrogation room."). As the Ninth Circuit put it in *Kim*, "If the police ask – not order – someone to speak to them and that person comes to the police station, voluntarily, precisely to do so, the individual is likely to expect that he can end the encounter." 292 F.3d at 974-75; *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (a suspect who speaks with the police voluntarily, even at the invitation of the police, is not "in custody").

On the evening of April 11, 2021, Special Agents Parker and Barker approached Defendant during daylight hours and asked Defendant if he would speak with them about a possible kidnapping.

| | |
|---|---|
| <u>SA Parker</u>: | Excuse me, sir?  Dr. Ilg? |
| <u>Defendant</u>: | Yeah. |
| <u>SA Parker</u>: | Can I speak with you for a minute?  My name is Special Agent Parker with the FBI. |
| <u>Defendant</u>: | Okay.<br>[Speaking to M.P.] You guys go ahead. |
| <u>SA Parker</u>: | Could we visit with you in here? |
| <u>Defendant</u>: | Sure. |
| <u>SA Parker</u>: | Come on in here, if you would? |

Ex. A at 3.  There were no threats accompanying the agents' introduction, and the agents did not make any promises to secure Defendant's acquiescence. The words used to speak with Defendant were inquires, not commands or demands. Both the corrected transcript and the audio itself demonstrate Defendant made the choice to accompany the agents to an airport conference room to answer questions. *Id*; Ex. B at 10:19-10:48.

United States' Response to Defendant's Motion to Suppress Statements - 10

Notwithstanding the foregoing, Defendant asserts in his declaration and briefing the FBI agents "commanded" Defendant to follow them into the conference room where the interview took place and "ordered" him to "come this way." ECF No. 96 at ¶ 3; ECF No. 95 at 15. While a law enforcement directive, *if it had actually happened*, would be more indicative of custody, Defendant's allegations are not borne out by the transcript or recording of the interview. The corrected transcript of the interview, which is enclosed in Exhibit A, and the audio recording of the interview, which is enclosed in Exhibit B, demonstrate that Defendant's characterization of the interview is inaccurate. No one commanded Defendant to do anything. Law enforcement asked Defendant to speak with them, and Defendant agreed. The first *Kim* factor therefore weighs strongly in favor of a finding Defendant was not in custody.

(2) The Extent to Which Defendant was Confronted with Evidence of Guilt

Next, the Court must consider the extent to which the FBI confronted Defendant with evidence of his guilt. In this regard, the Ninth Circuit has held that this factor weighs in favor of finding the interrogation custodial when the tone of the questioning is "aggressive, coercive, and deceptive." *Bassignani*, 575 F.3d at 884-85. For example, when law enforcement confronts a person with "fabricated evidence of guilt and engaged in elaborate deceptions," a finding of custody is more likely. *United States v. IMM*, 747 F.3d 754, 767 (9th Cir. 2014) (suppressing interview of a juvenile who was subjected to "intense psychological coercion"). In contrast, when the interview is a "consensual" conversation "conducted in an open, friendly tone," this factor weighs in favor of finding the interrogation non-custodial. *Id.*

When evaluating the degree to which a defendant is confronted with the evidence against him, the Ninth Circuit has held that the focus of this inquiry is on the overall tone and tenor of the interview. *Bassignani*, 575 F.3d at 884-85. Even when a defendant is "extensively questioned about evidence of his guilt," the Ninth Circuit has found this factor to weigh against a finding that the interview was custodial, so long as the interview "was conducted in an open, friendly tone" and the interviewee "participated

actively." *Id.* As another district court in the Ninth Circuit put it, a "confrontational interlude . . . does not contaminate the whole interview," which must be examined in its "totality." *United States v. Singh*, No. 2:13-CR-00084-GEB, 2017 WL 4355048, at *8 (E.D. Cal. Oct. 2, 2017), *aff'd sub nom. United States v. Sharma*, 851 F. App'x 708 (9th Cir. 2021); *see also United States v. Manning*, 312 F. App'x 34, 35 (9th Cir. 2009) ("While [the defendant] may have been confronted with evidence of her guilt, this is not the case where the agents repeatedly called her a liar, confronted her with misleading evidence, and pressed her for the truth").

Turning again to the evidence and facts in this case, the transcript and audio recording of the interview demonstrate FBI approached Defendant in a public setting and informed him they would like to ask him questions. The tone of the ensuing interview was conversational and friendly. Defendant and the FBI agents even joked about the availability of Uber services in Spokane. Ex. A at 5. Defendant also "participated actively" throughout the interview and expressed his willingness to talk about certain topics. *Id.* at 20, 32, 39. At two points, as Defendant was describing his plan to get a hitman to kill himself, Defendant expressed his desire to keep talking, stating, "Let me just finish." *Id.* at 30, 31.

To be sure, there was a point in the interview, where the FBI described certain of their evidence, including a general description of the transcripts of Defendant's messages on the dark web. *See id.* at 40. The FBI also indicated it may be possible or even likely Defendant might be arrested in the future and reminded Defendant that it is against the law to intentionally lie to the FBI. *See id.* Ultimately, this "confrontational interlude . . . does not contaminate the whole interview," which must be examined in its "totality."[5] *Singh*, 2017 WL 4355048, at *8. Here, the totality of the interview

---

[5] In evaluating the portion of the interview where the FBI discussed some of the allegations against him, this is not a case involving a susceptible juvenile prone to "intense psychological coercion" or deception. *See e.g.*, IMM, 747 F.3d at 767. It should not be lost on this Court that

United States' Response to Defendant's Motion to Suppress Statements - 12

demonstrates the agents spent most of the interview listening to Defendant's explanation for hiring hitmen from the dark web. They asked some follow up questions that were respectful and polite, but there is no evidence the agents lied or sought to deceive or coerce the Defendant into a confession. Accordingly, this factor is largely neutral and, given the overall tone of the interview, weighs marginally against a finding that Defendant was in custody for purposes of Miranda.

    (3) The Physical Surroundings of the Interview

    The third *Kim* factor considers "the physical surroundings of the interrogation." 292 F.3d at 974. For example, when an interview takes place in a neutral environment or inside a defendant's residence – as opposed to a small dark interrogation room inside a police station – this factor is more likely to favor a finding the defendant is not in custody. *See Bassignani*, 575 F.3d at 886 (holding that an interview conducted inside "enclosed conference room" at defendant's workplace was an indication the suspect was not in custody). On the other hand, when the defendant is isolated "from the outside world," this "largely neutralizes the familiarity of the location as a factor affirmatively undermining a finding of coercion." 292 F.3d at 885. This is so because "exposure to public view both reduces the ability of an unscrupulous policeman to use illegitimate means to elicit self-incriminating statements and diminishes [a suspect's] fear that, if he does not cooperate, he will be subjected to abuse." *United States v. Galindo-Gallegos*, 244 F.3d 728, 731-32 (9th Cir. 2001).

    Defendant's interview in this case was conducted inside relatively large, well-lit office space adjacent to the main hallway at the Spokane International Airport. The two doors leading out of the room were unlocked (there's no locking mechanism preventing

---

Defendant has a graduate level education, was employed as the medical director of his practice, and, according to witnesses as well as medical personnel, Defendant has a history of being narcissistic, domineering, and manipulative *See* ECF No. 47 (Ilg phycological exam, filed under seal); Bates 70000027.05. The FBI agents would have been derelict had they failed to ask follow-up questions regarding Defendant's counter-factual claims that he was hiring a hitman to kill himself.

anyone from exiting the room), and there was a small window next to the main door. *See United States v. Manning*, 312 F. App'x 34, 35 (9th Cir. 2009) ("The physical surroundings of the interrogation do not suggest that the agents exercised their dominion over Manning. She was questioned in an 18 by 25 foot comfortable appearing office with upholstered furniture and a large window."). Similarly, the interview room had large windows "expos[ing]" the conference room "to public view." *See Galindo-Gallegos*, 244 F.3d at 731. Below are photographs of the office space where Defendant was interviewed:

 

Exhibit C; *see also* Exhibit D (video depicting path from the concourse at the airport to the interview room).[6]

---

[6] Defendant argues that he was "led through various twists and turns in an internal area to an interview room with no windows" and that these surroundings indicate that he was in custody. ECF No. 95 at 15. However, Defendant's description of the conference room is demonstrably wrong. *See* Ex. B-C (photos and video of room). The interview room was a large conference space in an unused office area, but had two doors and several large windows. This room adjacent to the public hallway where agents first introduced themselves. *Id.* Contrary to Defendant's assertion that he could not recall how to return to the public area, the door to concourse was visible from inside the office space through a window in the vestibule area. *Id.* Additionally, while Defendant asserts that it took the FBI agents 30-45 seconds to get to the interview room (ECF No. 95 at 4), the recording indicates that it actually took about 7 seconds (*see* Exhibit B at 10:27-10:34).

1
2
3
4
5
6
7
8
9
10
11

During the interview, Defendant was seated on one side of the table and the two FBI agents were seated across from him. *See* Ex. C (depicting the setup of the room). As Defendant concedes, the FBI agents were dressed in plain clothing and never displayed or brandished their firearms. *See* ECF No. 95 at 4. At one point during the interview, Defendant accessed his phone and texted a traveling companion. Ex. A at 4. At other points, FBI personnel walked "in and out of the room" (Ex. A at 38, 39, 64-70). *See Bassignani*, 575 F.3d at 886 (emphasizing that where "several officers . . . went in and out of the room," this weighs against a finding of custody). Additionally, the size of the room – approximately 20' x 20' – afforded Defendant plenty of space to get up from the table and walk directly out of the office space and back to the concourse. *See* Exhibit D.[7]

12
13
14
15
16
17
18
19
20
21

Simply put, nothing about the interview location suggested the officers "exercised their dominion over" Defendant. *See Manning*, 312 F. App'x at 35. In fact, the evidence in this case stands in stark contrast to other settings in which courts have found the physical surroundings of an interrogation so oppressive as to give rise to a finding of custody. *See, e.g.*, *United States v. Barnes*, 713 F.3d 1200, 1204 (9th Cir. 2013) (finding custody where the defendant was searched and escorted through an electronically locked door inside a government probation building, where normally the defendant's parole meetings occurred); *United States v. Carroll*, 102 F. Supp. 3d 1134, 1138 (N.D. Cal. 2015) (finding custody where the defendant was interrogated in a small

22
23
24
25
26
27
28

---

[7] Defendant asserts that the FBI blocked his exit with Defendant's luggage. ECF No. 95 at 4. As depicted in the video and photographs of the office space, this assertion should not be credited. *See* Ex. B-C. A suitcase would not have prevented Defendant from leaving the conference room.

Similarly, while Defendant complains that there were approximately four FBI agents present at the airport, this is a far cry from those cases in which the Ninth Circuit has expressed concerns with the number of law enforcement agents present at an interview. *See e.g.*, Craighead, 539 F.3d. at 1085 (concluding that multiple agents dressed in "flak jackets" or "raid vests," some with their weapons unholstered, would be indicative of custody).

room in a police station about a ten-minute drive from his motel and defendant had no access to any form of transportation to leave). Again, the location of the conference room, the unlocked doors, exposure to the public view, and informal setup strongly indicate that Defendant was free to leave at any point. The third *Kim* factor therefore favors a finding Defendant was not in custody.[8]

### (4) Duration of the interview

The fourth factor under *Kim* pertains to the duration of the interview. *Kim* 292 F.3d at 974. Lengthy questioning – e.g., several hours – may weigh in favor of a finding that a defendant was in custody. *Bassignani*, 575 F.3d at 886. There is no specific length of time that defines a custodial interview, but the Ninth Circuit has described a two and a half hour interview as "at the high end." *Id.* Additionally, so long as the interview "[is] not a 'marathon session designed to force a confession,'" courts generally "accord less weight to this factor." *Id.*(quoting *Davis v. Allsbrooks*, 778 F.2d 168, 171(4th Cir. 1985)). In one case, the Ninth Circuit held that an interview of over four hours was non-custodial. *See Manning*, 312 F. App'x at 35.

Here, the interview itself lasted approximately an hour and twenty-seven minutes. *See* Ex. B at 10:00 – 1:37:20 (duration from when FBI asked to speak with Defendant to the conclusion of the conversation); *see also* Ex. A.[9] Throughout the interview,

---

[8] Defendant asserts that the physical surroundings of the interview were coercive because he was "isolated" from his girlfriend and her children who were traveling with him. ECF No. 95 at 14. The recordings, however, belie that law enforcement separated Defendant from his traveling companions. Defendant did that himself. When Defendant was approached by Special Agent Parker, Defendant told his travel companions "you guys go ahead." Ex. A at 3; Ex. B at 10:19-10:34. Then, when the FBI indicated that the voluntary interview might last a few minutes, Defendant texted his girlfriend and directed her to leave without him. *See* Ex. A at 4.

[9] The total length of the recording is over two hours, but this includes several minutes while the FBI was awaiting the arrival of Defendant's flight as well as the time Defendant waited for the FBI to complete the extraction of Defendant's smartphone. Ex. B. The recording also include

United States' Response to Defendant's Motion to Suppress Statements - 16

Defendant participated actively, leading much of the conversation. *Id.* Early on, when Defendant referenced an attorney, the FBI was clearly prepared to end the interview. *See* Ex. A at 17; Ex. B at 24:45-25:03. Defendant, however, continued the discussion describing in detail a plot to hire a dark web hitman to harm himself. *Id.* at 20-38. Given the duration of the interview was about an hour and a half, and in light of Defendant's role in continuing the interview, this factor also appears to be neutral and may even marginally weigh against finding that Defendant was in custody. Nothing about the interview suggest it was "a marathon session designed to force a confession." *See* 575 F.3d at 886.

(5) <u>Degree of Pressure Applied to Detain the Individual</u>

The fifth *Kim* factor – the degree of pressure used to detain the defendant – further demonstrates that the FBI's interview was non-custodial. The Ninth Circuit has "consistently held that a defendant is not in custody when officers tell him that he is not under arrest and is free to leave at any time." *Bassignani*, 575 F.3d at 886. Indeed, "[p]erhaps most significant for resolving the question of custody, Defendant was expressly told he was not under arrest." *United States v. Crawford*, 372 F.3d 1048, 1060 (9th Cir. 2004). As the Ninth Circuit succinctly put it in *Norris v. United States*,

> Norris voluntarily accompanied the officers to the substation. He was told that his cooperation was voluntary and that he was free to terminate the interview at any time. Norris was also told that he was not under arrest and he was never restrained in any way. Upon completion of the interview, Norris was taken home by the officers. Considering the totality of the circumstances from the perspective of a reasonable person in Norris's position, Norris was not in custody for purposes of Miranda.

428 F.3d 907, 912 (9th Cir. 2005); *see also Craighead*, 539 F.3d at 1087 ("[I]f a law enforcement officer informs the suspect that he is not under arrest, the statements are

---

Defendant's ride to his home. *See id.* Additionally, it should be noted that Defendant's voice is muted compared to the FBI agents' voices as the recorder was on Special Agent Parker's person.

voluntary, and that he is free to leave at any time, this communication greatly reduces the chance that a suspect will reasonably believe he is in custody.").

In this case, Defendant was told in no uncertain terms that he was there of "[his] own will" and "if you ever want to get up and walk out, you're free to do that." Ex. A at 17. The FBI also specifically told Defendant he was not under arrest and that the FBI did not have a warrant for his arrest. *Id.* at 18. At the very outset of the interview, the FBI specifically stated,

> We're trying to get things – you know, get some answers to these questions. Get you in here and get you out of here. As soon as we're done here, you're out of here. So, we'll hopefully get on the road as quick as we can.

*Id.* at 5.[10] In response, Defendant clearly understood he was not under arrest, stating, "Yeah. I mean, I can catch an Uber, if I need to. So that's fine."[11] *Id.* Finally, as noted

---

[10] In *Bassignani*, the Ninth Circuit addressed language almost identical to this – "you'll walk out of here when we're done." 575 at 886 n.8. Although the trial court interpreted this language as suggesting the suspect was not free to leave, the Ninth Circuit held this "statement proves the opposite point." *Id.* Just like in *Bassignani*, Special Agent Barker "was reassuring [Ilg] that he was not under arrest; he was not implying that [Ilg] was confined to the conference room." *Id.*

[11] Defendant further asserts he was not truly free to leave because law enforcement seized his phone, which, according to Defendant, left him without any means to get home from the airport given Defendant's traveling companions had already left. ECF No. 95 at 13. Defendant's argument omits that Defendant told his traveling companion to leave. Ex. A at 4. Additionally, the notion that Defendant – a neonatologist with a substantial income – was somehow stuck, ignores that he was at an international travel hub with taxis and other forms of transportation available. In fact, Defendant stated himself that he could get an Uber to take him home. Ex. A at 5. That Defendant ultimately decided against these forms of transportation and accepted the FBI's offer to give him a ride does not mean he was any less free to leave. In this regard, Defendant's reliance on *United States v. Toliver*, 480 F.Supp.2d 1216, 1219 (D. Nev. 2007), is unavailing. In *Toliver*, the suspect, who had just been released from jail, was driven directly from the jail to the police station by law enforcement. *Id.* The suspect was then left in an interrogation room for nearly an hour by himself. *Id.* He was never informed

above, the FBI never handcuffed Defendant, never brandished firearms, and never blocked his pathway out of the office space or the airport. *See* Ex. A, B-C.

Defendant argues he was not actually free to leave because the FBI executed a search warrant for his luggage, person, and phone during the interview. ECF No. 95 at 14. A search warrant, however, did not convert a voluntary interaction into a "restraint on freedom of movement of the degree associated with a formal arrest." *Stansbury*, 511 U.S. at 322. Police routinely interact with suspects during the execution of a search warrant. *See e.g.*, *Michigan v. Summers*, 452 U.S. 692, 702 (1981) (holding that the execution of a search warrant is "substantially less intrusive" than an arrest and involves "neither the inconvenience nor the indignity associated with a compelled visit to the police station"). If the existence of a search warrant were sufficient to establish custody, this would be a substantial departure from established precedent. *See id.* A search warrant for a phone is not the type of restraint that a reasonable person would equate to a restriction on freedom akin to an arrest. This is particularly true here given that immediately after the FBI told Defendant about the search warrant for his phone and luggage, the agents again stated Defendant could leave at any time.[12] *See* Ex. A at 19.

_____

that he was free to leave, and, because he had been picked up at the jail, had no way to get home. *Id.* These facts are substantially different than the interview at the airport at issue here.

[12] Defendant relies on *Kim* and *Craighead* for his assertion that the execution of a search warrant for a phone and luggage equates to custody. *See* ECF No. 95 at 13. These cases say no such thing. In *Kim*, for example, the court held that the suspect was in custody – not because of the execution of a search warrant – but because law enforcement locked the doors, excluded the suspect's family from the interview space, and proceeded with an interview even though the suspect, (whose English was limited) did not appear to have a "complete understanding of the overall situation." 292 F.3d at 977. *Craighead* involved the execution of a search warrant of the suspect's home, which was "crawling with law enforcement." 539 F.3d at 1083. Seizure of a suspect's phone and luggage are not analogous to the type of pervasive search at issue in *Craighead*. *See id.*; *see also United States v. Bekowies*, 432 F.2d 8 (9th Cir. 1970) (concluding that a suspect detained during a search warrant of his home was in

Nothing the FBI did here exerted pressure on Defendant to somehow detain him. Accordingly, the fifth *Kim* factor also weighs in favor of a finding that Defendant was not in custody in this case.

<u>Totality of the Circumstances</u>

In sum, and considering these factors in total, a reasonable innocent person in Defendant's shoes would have felt free to terminate the interview and leave. The language used to summon Defendant was not indicative of someone in custody. Defendant voluntarily accompanied the agents to a vacant office after a professional and non-threatening request. While Defendant may have been confronted with evidence of his guilt, this is not the case where the agents repeatedly called him a liar, confronted him with misleading evidence, and pressed him for a full confession. The agents instead discussed certain inconsistencies that they found during their investigation, and, based on Defendant's response, shared how their investigation varied from his account.

Throughout, the FBI agents treated Defendant professionally and courteously, and the physical surroundings of the interrogation do not suggest the agents exercised their dominion over Defendant. He was questioned in an approximately 20' x 20' office with furniture, a table, and large windows. The door to this room was closed, but it was not locked. While Defendant was questioned for over an hour, he denied hiring the hitmen to harm his wife and former work colleague. When the FBI was preparing to wrap up the interview, Defendant re-initiated the discussion and stated he hired dark web hitmen in efforts to commit suicide by hitman. Significantly, Defendant was told that he was free to leave at any point during the interview and would be taken home – which in fact happened. No pressure was applied to detain Defendant. He was not threatened, restrained, or subject to any physical or psychological pressure during the interview. Defendant simply was not in custody.

---

custody because the home was surrounded by law enforcement, who were seeking to apprehend a fugitive believed to be inside the suspect's home).

**B. The FBI Was Not Required to Terminate the Voluntary Non-Custodial Interview when Defendant Asked whether He Should Have a Lawyer.**

When law enforcement speaks with someone who is not in custody, the officers have no duty to stop their interview when that person asks about having a lawyer. The Supreme Court has held that the procedural safeguards of Miranda – including the warnings and the requirement that officers "must cease" interrogation following an invocation of the right to counsel – are triggered only by a custodial interrogation. *Minnesota v. Murphy*, 465 U.S. 420, 424 n. 3 (1984). In *Murphy*, the Supreme Court explained, "Although a request for a lawyer during custodial interrogation is sufficient to invoke the privilege against self-incrimination, [the suspect] was not in custody, and he had no federal right to have an attorney present at the meeting." *Id.* (internal citations omitted). The Ninth Circuit affirmed this principle in *United States v. Hines*, 963 F.2d 255 (9th Cir. 1992). There, a federal agent visited a defendant and questioned him about certain activities. *Id.* at 256. The defendant responded that he wanted to speak with his court appointed attorney. *Id.* The agent then left, but returned shortly thereafter and asked several questions without the attorney present. *Id.* Although the district court suppressed the defendant's confession, the Ninth Circuit *reversed*, stating that the agent was not required to terminate questioning when the defendant, who was not in custody, asked for an attorney:

> It is well established that . . . that the Fifth Amendment right to counsel under *Miranda* does not vest until a defendant is taken into custody. Therefore if [the defendant] was not in custody during the first interview, the reference to his lawyer at that time cannot be considered an invocation of *Miranda* rights.

*Id.*; *see also McNeil v. Wisconsin*, 501 U.S. 171, 182 n. 3 (1991) ("We have in fact never held that a person can invoke his Miranda rights anticipatorily, in a context other than 'custodial interrogation'").

Other courts have further affirmed that law enforcement is not required to cease questioning when an out-of-custody suspect asks for a lawyer. In *Burket v. Angelone*, for example, the Fourth Circuit held the defendant "could not invoke the protections

provided by Miranda" because "his freedom of action" was not "curtailed to a degree associated with arrest." 208 F.3d 172, 197 (4th Cir. 2000); *see also United States v. Wyatt*, 179 F.3d 532, 537 (7th Cir.1999) ("The Fifth Amendment right to counsel safeguarded by Miranda cannot be invoked when a suspect is not in custody."). As the Tenth Circuit has put it, if a suspect is not in custody, "then his attempts to invoke his right to remain silent and his Miranda right to counsel are ineffective." *United States v. Bautista*, 145 F.3d 1140, 1149 (10th Cir. 1998).

Judge Quackenbush put it this way in a case arising within the Eastern District of Washington:

> If it were determined that Mr. Murinko was, in fact in custody when he asked if he needed an attorney, the FBI agents would have been required . . . to halt the questioning at that point and clarify the request. However, the court has found that Mr. Murinko was not in custody at the December 19, 2007 interview, and, accordingly, the agents response that they could not give legal advice was proper.

*United States v. Murinko*, No. CR-09-027-JLQ, 2009 WL 2487042, at *7 (E.D. Wash. Aug. 12, 2009), *aff'd*, 410 F. App'x 2 (9th Cir. 2010). Although the agents continued with the interview, asking numerous additional questions, the court denied Defendant's motion to suppress. *Id.* at 2, 7.

In this case, Defendant did say it was his preference to have a lawyer present during the interview. Ex. A at 18. Notwithstanding this statement, Special Agents Parker and Barker had no duty to stop the interview under Miranda because Defendant was not in custody. Again, Miranda does not apply in a non-custodial setting, and any expression of a desire for counsel had no legal effect. As set forth in great detail above, Defendant was told that he was not under arrest and that he was free to leave. Had Defendant wished to hold off answering questions until he had a lawyer present, he could have stopped answering questions or left the premises – as he eventually did. Defendant's constitutional rights were not violated when said he may want a lawyer, was told he was free to go, but then initiated further discussion with the FBI.

United States' Response to Defendant's Motion to Suppress Statements - 22

What is more, even when Defendant did reference an attorney, he immediately reinitiated discussion with law enforcement. For example, the first time Defendant referenced an attorney, the FBI paused the interview, explained that the agents were not able to give legal advice, offered to end the interview, and told Defendant that he could be on his way. Ex. A at 17. When the FBI mentioned the warrant to search Defendant's phone, he decided he would wait for the FBI to finish the phone extraction and then *spontaneously volunteered* information that the FBI would discover on the phone:

| | |
|---|---|
| Defendant: | Before I go, should I have a lawyer? |
| SA Barker: | That's always up to you. That's your call. |
| Defendant: | Yeah. |
| SA Parker: | Yeah. You're here of your own will. |
| Defendant: | Yeah. |
| SA Parker: | If you ever want to get up and walk out, you're free to do that. But I – you know, we can't give legal advice. |
| Defendant: | Right. You know, I'll be honest with you, I watched a YouTube video about three months ago. There was a prosecutor and detective. And both of them said: Never talk to a police officer without your lawyer present. It doesn't matter if you're guilty or not, never talk to them. |
| | So, I prefer that, at this point, is to have a lawyer. Not because I have anything to hide. |
| SA Parker: | Uh-huh. |
| Defendant: | But more because – because of the advice I actually heard on YouTube. So . . . |
| SA Parker: | Okay. |
| SA Barker: | Okay. With that, we do have a warrant for your personal device. |
| Defendant: | Which one? |
| SA Parker: | Well, we actually have a warrant for your person and all your luggage. So – |
| Defendant: | For me, personally? |

| | | |
|---|---|---|
| 1 | SA Parker: | Yes. So what that means is we have a search warrant, a federal search warrant. |
| 2 | Defendant: | Oh, a search warrant? |
| 3 | SA Parker: | Yes.  Not an arrest warrant. |
| 4 | Defendant: | Okay. |
| 5 | SA Parker: | Not being arrested tonight |
| 6 | Defendant: | That's what I – |
| 7 8 | SA Parker: | And so, we do just need to search you.  We'll need to search your luggage, your checked bag, looking for the items outlined in the warrant. |
| 9 | Defendant: | Okay. |
| 10 11 | SA Parker: | And we will – you know, you will get a copy of the warrant, as well as a receipt for everything that we seize. |
| 12 | Defendant: | Okay. |
| 13 14 | SA Parker: | If you are – if you are interested, as I mentioned, we have a warrant for digital items in general, but specifically, for a phone. |
| 15 16 17 | | If you would like us to forensically image that for right now and have you wait, when we're done, you can take it with you.  Or we can take it and you can be on your way. |
| 18 | Defendant: | Umm.  Boy.  It's my only means of communication is why I'm hesitating. |
| 19 | SA Parker: | Oh, I know.  Without that phone, none of us can function. |
| 20 21 | Defendant: | Right. Why don't you guys do that, do the digital imaging while I wait. |
| 22 | SA Parker: | Okay. |
| 23 | Defendant: | That way, I have my phone. |
| 24 | SA Parker: | Okay. |
| 25 26 | | And there is the caveat that if something goes wrong and we're not able to do it, for some technical glitch or reason, then we would need to send it off to a lab.  Just kind of -- |
| 27 | Defendant: | Okay. |
| 28 | SA Parker: | -- in full disclosure. |

United States' Response to Defendant's Motion to Suppress Statements - 24

| | | |
|---|---|---|
| 1 | Defendant: | No, no. That's fine. |
| 2 | SA Parker: | We'll do what we can.  We're gonna be completely honest with you. We're not here to yank you around. |
| 3 | Defendant: | Okay. No, that's fine. *There's one thing that I will share with* |
| 4 | | *you, since I don't have my lawyer. But I did put it on here. I* |
| 5 | | *will just read it to you, because you are going to see it* |
| 6 | | *anyway. And the reason I put it on there is because I was, uh,* *let me just read it to you.* |

7  Ex. A at 17-20 (emphasis added); Ex. B at 24:45-27:52. Defendant then read a document

8  from his phone detailing his version of why he used Bitcoin to hire a hitman on the dark

9  web. Ex. A at 20 – 38.  In other words, the FBI appeared to be wrapping up the interview

10 and preparing to execute the search warrant when Defendant initiated further discussion

11 and divulged information about hiring hitmen on the dark web. *See, e.g.*, *Edwards v.*

12 *Arizona*, 451 U.S. 477, 485 (1981) (concluding there is no violation of Miranda when

13 the "accused has himself initiates further communication, exchanges, or conversations

14 with the police.").

15      At other points in the interview when Defendant referenced an attorney, he did

16 so in passing and then continued a lengthy narrative that included a description of his

17 activities on the dark web:

| | | |
|---|---|---|
| 18 | Defendant: | [Witness 1] found out about it and got all frustrated.  And |
| 19 | | then – and so – and she – and she believed  that I was using |
| 20 | | this phone to communicate with women, because that's – |
| 21 | | again, there's so much to this story, it's just hard to – I – again, *I should have my lawyer here, but whatever*. |
| 22 | | She -- Witness 1 has a tendency to break up with me every |
| 23 | | three or four weeks, because she just gets pissed off about stuff.  And she kind of just gets pissed off about it. |

24 Ex. A at 32 (emphasis added). At another point, Defendant opened the door further –

25 stating he was willing to talk about some subjects without a lawyer, but not others:

| | | |
|---|---|---|
| 26 | Defendant: | So, I'm okay talking about this stuff that we just talked |
| 27 | | about [i.e., dark web hitmen]. *But if we go much further than* *that*, I want to have a lawyer. |
| 28 | | |

United States' Response to Defendant's Motion to Suppress Statements - 25

| SA Parker: | Okay. |
| Defendant: | Is that fair? |
| SA Parker | Absolutely. |

Ex. A at 39 (emphasis added). At best, these are ambiguous references to an attorney – i.e., not a clear, unequivocal indication that Defendant was requesting an attorney. *See Tobias v. Arteaga*, 996 F.3d 571, 580 (9th Cir. 2021) ("[W]e have found statements such as "I think I would like to talk to a lawyer," "Maybe he ought to see an attorney," and "[I] might want to talk to a lawyer," ambiguous); *see also Davis v. United States*, 512 U.S. 452 (1994) (holding that to invoke the Fifth Amendment right to counsel during a custodial interrogation, a defendant must invoke the right in clear, unambiguous terms).

Later in the interview, Defendant made statements about having a lawyer to better navigate potential cooperation with law enforcement. *See, e.g.*, Ex. A at 45, 50-52, 60, 62. Each time, Defendant appears to have continued a narrative without prompting from the FBI. Of course, as noted above, even if Defendant had unequivocally asked for an attorney – which he did not – this would not have required the FBI to terminate the interview given that Defendant was not in custody. *See Hines*, 963 F.2d at 256.

**C. Defendant's Statements Were Voluntary**

According to Defendant's motion, his statements should also be suppressed as involuntary. *See* ECF No. 95 at 20 (asserting that Defendant's documented mental state made his statements involuntary). In evaluating whether a defendant's statements are in fact voluntary or involuntary, this Court must consider whether the statements were the product of governmental coercion. As the Supreme Court has explained, "wherever a question arises whether a confession is incompetent because [it was] not voluntary, the issue is controlled by that portion of the Fifth Amendment . . . commanding that no person 'shall be compelled in any criminal case to be a witness against himself [or herself].'" *Missouri v. Seibert*, 542 U.S. 600, 607 (2004); *Colorado v. Connelly*, 479 U.S. 157, 163-64 (1986) ("[C]oercive police conduct" is a "crucial element" to find that

a statement was "involuntary."). "In evaluating voluntariness, the test is whether, considering the totality of the circumstances, the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." *United States v. Bautista*, 362 F.3d 584, 589 (9th Cir. 2004) (quoting *United States v. Male Juvenile*, 280 F.3d 1008, 1022 (9th Cir. 2002)).

The Supreme Court has established a multi-faceted test for determining whether a defendant's will was overborne in any particular case, explaining courts should "assess[] the totality of the surrounding circumstances – both the characteristics of the accused and the details of the interrogation." *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). Ultimately the factors courts may take into account include "the youth of the accused; his lack of education; or his low intelligence; the lack of any advice to the accused of his constitutional rights; the length of detention; the repeated and prolonged nature of the questioning; and the use of physical punishment such as the deprivation of food or sleep." *Id.*

None of these factors suggest Defendant's will was overborne in this case. At the time of the interview, Defendant was a highly intelligent, 54-year old doctor with a graduate-level education. *See* ECF No. 47 at 14. The interview was approximately 1.5 hours, and the tone was curious, professional and polite. *See generally* Ex. A. While the FBI did not read formal Miranda warnings, they told him he was free to leave and Defendant clearly understood he was under no obligation to speak with the police without having a lawyer present. *Id.* at 39 ("So, I'm okay talking about this stuff that we just talked about. But if we go much further than that, I want to have a lawyer.").

The recording further demonstrates Defendant was not intimidated by the FBI. Ex. B. He pushed back against the FBI evidence and maintained his own narrative of what happened. *Id.* While the FBI challenged Defendant's version of events – i.e., that he hired the hitman to kill himself – Defendant never admitted to hiring a hitman to harm his wife or a former colleague. *See* Ex. A. That Defendant maintained his version of what happened is strong evidence that his will was not overborne. *See, e.g., United*

*States v. Perez*, 538 F. App'x 818, 819 (9th Cir. 2013) ("That a suspect remains in control of his responses and consistently denies guilt is compelling evidence that his will was not overborne.") (citing *Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005).

Defendant argues his interview was involuntary because, prior to the interview, he may have contemplated suicide and had experienced depression. ECF No. 95 at 20. In the interview, however, Defendant indicated his mental health was getting "a bit better." Ex. A at 27. Significantly, immediately after saying his mental health was getting better, Defendant spontaneously divulged the information about his activities on the dark web without even been asked about those activities. Ex. A at 27. Defendant's incriminating statements were not the result of any conduct by the government. His statements were not involuntary.

**D. Physical Evidence Obtained as a Result of Defendant's Statements Should be Suppressed.**

Even assuming *arguendo* that Defendant was in custody during his interview with the FBI, which he was not, this does not warrant suppression of any physical evidence later recovered as a result of Defendant's statements. "The Supreme Court determined in *United States v. Patane*, 542 U.S. 630, 124 (2004) that the physical evidence obtained as a result of a custodial interrogation without Miranda warnings is nevertheless admissible." *United States v. Mora-Alcaraz*, 986 F.3d 1151, 1157 (9th Cir. 2021). As the Ninth Circuit reemphasized in *Mora-Alcaraz*, derivative evidence obtained in violation of Miranda is admissible so long as, "looking at the totality of the circumstances," the defendant's statements leading to the seizure were "voluntary." *Id.*

Here, Defendant does not identify any derivative evidence that he suggests should be subject to suppression. *See* ECF No. 95. This is likely so because any such evidence almost certainly would have been subject to inevitable discovery. *See United States v. Reilly*, 224 F.3d 986, 994 (9th Cir. 2000) ("The inevitable discovery doctrine . . . permits the admission of otherwise excluded evidence 'if the government can prove that the evidence would have been obtained inevitably and, therefore, would have been admitted

1  regardless of any overreaching by the police'"). In any event, for the reasons set forth
2  in Section C above, Defendant's statements were voluntary. Any such evidence is not
3  subject to suppression.

### CONCLUSION

4
5      The Court should deny Defendant's motion to suppress statements from his
6  voluntary interview with the FBI.  Defendant was not in custody for purposes of
7  *Miranda*, and the FBI therefore was not required to terminate the interview when
8  Defendant referenced a lawyer.

9
10     DATED May 19, 2022

11
                              Vanessa R. Waldref
12                            United States Attorney

13
                              s/ *Richard R. Barker*
14                            Richard R. Barker
15                            Assistant United States Attorney

16

17                 **CERTIFICATE OF SERVICE**

18     I hereby certify that on May 19, 2022, I electronically filed the foregoing with
19  the Clerk of the Court using the CM/ECF System which will send notification of such
20  filing to counsel of record.

21
                              s/ *Richard R. Barker*
22                            Richard Barker
                              Assistant United States Attorney
23

24

25

26

27

28

United States' Response to Defendant's Motion to Suppress Statements - 29