Vanessa R. Waldref
United States Attorney
Eastern District of Washington
Richard R. Barker
Patrick J. Cashman
Assistant United States Attorneys
Post Office Box 1494
Spokane, WA 99210-1494
Telephone: (509) 353-2767

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

| UNITED STATES OF AMERICA, | Case No. 2:21-CR-0049-WFN-1 |
|---|---|
| Plaintiff, | |
| v. | United States' Sentencing Memorandum and Motion for an Upward Variance/Departure |
| RONALD CRAIG ILG, | |
| Defendant. | |

The United States of America, by and through United States Attorney Vanessa R. Waldref and Assistant United States Attorneys Richard R. Barker and Patrick J. Cashman, submits this sentencing memorandum and motion for an upward variance/departure. As set forth herein, the United States respectfully asks the Court to sentence the Defendant, Ronald Craig Ilg, to the top of the applicable 11(c)(1)(C) Sentencing Range. Based on the egregious offense conduct, Defendant's extensive efforts to conceal his offense, his false statements to the FBI, his efforts to object justice, and a pattern of domestic abuse that Defendant describes as "Biblically based," the United States submits that a sentence of anything less than 96 months of incarceration is not justice to the victims in this case. The United States also seeks $30,966 in restitution, a fine of $250,000, and thirty-six months supervised release.

United States' Sentencing Memorandum – 1

# STATEMENT OF FACTS

In early 2021, Defendant attempted to hire hitmen on the dark web to harm a former work colleague (Victim 1) and to kidnap Defendant's estranged wife (Victim 2). In doing so, Defendant transmitted dozens of messages from Eastern Washington, Mexico, and elsewhere to websites on the dark web operated outside the Eastern District of Washington. As part of this plan to hire dark web hitmen, Defendant used the moniker "Scar215" and logged into the sites using the password "Mufasa$$" to conceal his identity. It total, Defendant paid approximately $60,000 in Bitcoin to advance his schemes. ECF No. 140 at ¶ 8.

## Threats to Harm Victim 1

Beginning in early January 2021 and continuing until February 2021, Defendant accessed a site on the dark web to solicit a purported hitman to assault Victim 1, a neonatologist, who previously worked in Defendant's medical practice. In messages with the purported hitman, Defendant specified that Victim 1 "should be given a significant beating that is obvious. It should injure both hands significantly or break the hands." Defendant also provided Victim 1's address to the purported hitman along with a link to Victim 1's employer and Victim 1's picture. *Id.*

To advance this threat to harm Victim 1, Defendant paid approximately $2,000 in Bitcoin. In follow-up messages to the operators of the dark website, Defendant became frustrated when he did not receive confirmation of the assault. He also added, "I would like to see evidence that it happened. If this goes well, I have another, more complicated job" for "[a]n entirely different target with entirely different objectives." *Id.* The different target turned out to be Defendant's now ex-wife and the mother of his young child.

## Threats to Kidnap Victim 2

Beginning in late March 2021 and continuing until April 11, 2021, Defendant accessed the dark web to solicit a purported hitman to kidnap Victim 2, who, at the

time, was Defendant's estranged wife. In fact, when Defendant solicited the hitman, he was subject to a no contact order prohibiting Defendant from having direct or indirect contact with Victim 2. ECF No. 142 at ¶ 8.

As part of his deranged plot to kidnap Victim 2, Defendant solicited hitmen from at least two sites on the dark web. Defendant then paid approximately $60,000 in Bitcoin for these hitmen to kidnap Victim 2, extort her, inject her with heroin, and hold her hostage for seven days. Defendant even structured a bonus scheme for increasing the payment to the hitman so long as certain goals were achieved:

> To earn the additional associated bonus, within 2 weeks of the target being released, she will have completed the specific goal.
>
> 1. Permanently withdraw all court motions and all mediated agreements. Bonus $10k
>
> 2. Return to your husband by asking to move back home AND fucking him at least three times within the 2 week time frame Bonus: $10k
>
> 3. Keep her mouth shut and tell no one, ever about the kidnapping Bonus $10k
>
> 4. Inject her daily with heroin and teach her to do it AND supply pics and videos of her injecting herself. $5k
>
> 5. Plant drugs and used needles with her DNA in the needles through her home. Provide some pics of drugs and needles scattered around $5k

As part of the scheme, Defendant suggested the hitmen use any and "all means necessary," including, but not limited to, threatening to severely beat Victim 2's father, slaughtering Victim's dog, and threatening to cause Victim 2's older son to become addicted to heroin. In these messages, Defendant provided Victim 2's address, a link to her place of employment, as well as specific information about her work schedule. *Id.*

Around the same time Defendant attempted to have Victim 2 kidnapped, Defendant also solicited a hacker on the dark web to hack into Victim 2's electronic

devices and accounts to "infect [her] computer so it is not usable," to "delete all her files in her phone and on her computer," to access "her cameras and delete everything," and plant messages in his estranged wife's electronic devices indicating she was using drugs. Defendant also paid approximately $3,000 in Bitcoin to Dark Web Hackers, which advertised the ability to hack into a person's social media and computer to plant evidence. *Id.*

<u>Defendant's False Statements and Witness Tampering</u>

After the FBI identified this nefarious plot and confronted Defendant with the evidence against him, Defendant took several actions demonstrating consciousness of guilt. In fact, the same day the FBI asked Defendant about his activities on the dark web, Defendant lied – claiming he hired a hitman to kill himself. Later that evening, after the FBI found a sticky note containing Defendant's login information for the dark websites in a biometric safe, Defendant attempted to take his own life – describing his behavior as an "irreparable fuck up." In a note to his family, which was placed next to a business card from the FBI, Defendant prayed for forgiveness and said he was sorry for what he had done. ECF No. 142 at ¶8.

After being taken into custody, Defendant's criminal behavior did not stop. Instead, Defendant attempted to tamper with at least one of the witnesses against him – begging a key witness to marry him so he could have control over whether she would testify. If the witness did so, Defendant offered to pay tuition for her children to attend private schools in Spokane. Defendant then directed the witness to burn the letter – i.e., the very evidence of his efforts to tamper with the witness. *Id.*

## SENTENCING CALCULATIONS AND DEFENDANT'S OBJECTIONS TO THE PSIR

The government has reviewed U.S. Probation Officer Cassie Lerch's thorough and detailed Presentence Investigation Report (PSIR) and agrees with Probation's determination that Defendant's criminal history category is I and his total adjusted offense level is 27. *See* ECF No. 145 at ¶ 94. Based on his adjusted offense level and

United States' Sentencing Memorandum – 4

criminal history category, the government agrees that Defendant's guidelines range is 70 – 87 months' imprisonment. *Id.* at ¶154. While Defendant does not challenge these Guideline calculations (ECF No. 146 at 3), he objects to certain information contained in the PSIR to include: background regarding Defendant's relationship with Witness 1, evidence that Defendant entrapped Witness 1 in a septic tank in his backyard, and a description of Defendant's lewd activities in the presence of a minor child. *See* ECF No. 146.

Defendant's objections to the PSIR are meritless and ignore Congress's plain mandate that there is "[n]o limitation . . . on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. 3661. Moreover, the Sentencing Guidelines themselves specify as follows:

> When any factor important to the sentencing determination is reasonably in dispute, the parties shall be given an adequate opportunity to present information to the court regarding that factor. In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.

U.S.S.G. § 6A1.3(a). Here, the United States has submitted extensive documentation, supporting U.S. Probation's sentencing calculation as well as the information describing the offenses for which Defendant is being sentenced. Defendant's challenges are largely to the characterization of his own statements (e.g., obtained from his own text messages) as well as to the inclusion of detailed information regarding the criminal acts Defendant directed at the victims and witnesses in this case.

While Defendant repeatedly argues that certain of his actions are beyond the scope of this case, he ignores that such actions are relevant to Defendant's

characteristics and history. *See* ECF No. 146. For instance, while Defendant argues that sexually assaulting Witness 1, making her sign a "sex contract," and forcing Witness 1 into a septic tank in his backyard is not relevant to the charged offenses (*see* ECF No. 145 at ¶¶ 36, 43, 47, 52—61), such conduct is relevant to Defendant's intent as well as his pattern and practice of manipulating and exerting control over women. *See* Fed. R. Evid. 404(b).[1] This pattern and practice – as demonstrated by Defendant's continuous efforts to control Witness 1 – also is relevant to the "background, character, and conduct" of Defendant. 18 U.S.C. 3661.

Defendant further challenges the information in Paragraph 46 of the PSIR – i.e., that Defendant was trying to buy drugs to plant on his ex-wife – as inadmissible hearsay. *See* ECF No. 146 at 9. Here, Defendant ignores that the Federal Rules of Evidence do not apply at sentencing. *See* § 6A1.3(a). That Defendant wanted to procure drugs and plant them on his ex-wife cannot be disputed – that's precisely what he wanted the dark web hitmen to do to his ex-wife. Accordingly, the information in this paragraph has sufficient indicia of reliability to support its probable accuracy.

Throughout his lodged objections, Defendant challenges information in the PSIR, arguing that such information is not "relevant conduct" for purposes of his Guideline calculation *See generally* ECF No. 146. For example, Defendant objects to information in Paragraph 48 of the PSIR regarding a video that depicts Defendant masturbating approximately two feet away from a young minor child. *See* ECF No. 146 at 10; PSIR ¶48). Neither the government nor U.S. Probation, however, is seeking an upward adjustment in Defendant's Guidelines Range, on the basis of the challenged

---

[1] In his objections to the PSIR, Defendant asserts that the text messages between Defendant and Witness 1 were not previously provided in discovery. ECF No. 146 at 9. After Defendant filed his objections, the United States has provided the Defendant with specific Bates stamp numbers and location of these messages, which were in fact provided in the ordinary course of discovery in this case.

conduct. *See generally* ECF No. 145. Rather, Defendant's conduct, including by subjecting a minor child to such lewd and explicit conduct, is material to Defendant's history and characteristics and is properly included in the PSIR. *See* 18 U.S.C. § 3553(a).[2]

## VICTIM IMPACT & RESTITUTION

The victim impact in this case demonstrates the seriousness and egregiousness of Defendant's offenses. He set into motion a course of action that, if successful, would have resulted in his ex-wife's kidnapping, her drug addiction, harm to her family, and possibly even his ex-wife's death at the hands of a hired assassin. Defendant even attempted to have a professional colleague physically assaulted in efforts to destroy her livelihood. Defendant endangered his children, and he even forced an intimate partner into dark pit for hours, as he sought to maintain control over his female victims.

Although the plan ultimately was thwarted thanks to an informant who led the FBI to Defendant's activities, each of the victims suffered severe emotional and psychological harm. The United States anticipates submitting letters from Victims 1 and 2 to the Court and Defense prior to sentencing. These victims and their families

---

[2] Defendant also complains about information in the PSIR regarding Defendant's suggestive text messages to his child's nanny – arguing that the government cannot use the messages as a "sword" to prejudice him at sentencing and as a "shield" to corroborate a search warrant. ECF No. 146 at 11. This argument ignores that all probative evidence is prejudicial. *See, e.g.*, *United States v. Archuleta*, 737 F.3d 1287, 1293 (10th Cir.2013). What matters is whether the evidence is unfairly prejudicial, which, in this case, it is not. *See* Fed. R. Evid. 403.

Defendant further complains about the inclusion of Defendant's own statements to the PSIR writer in Paragraph 113 of the PSIR that his "submissive/dominant lifestyle was Biblically based." *See* ECF No. 146 at 14. Because Defendant offered these statements to the PSIR writer in explanation for his crimes, he cannot now claim these statements are somehow irrelevant.

United States' Sentencing Memorandum – 7

also are expected to be present at sentencing and may, as is their right, ask to be heard at the time of sentencing.

The victims of Defendant's crimes have suffered significant costs stemming from counseling, legal fees, and other expenses. For these injuries, expenses, and future expenses, the United States is seeking $15,600 in restitution for Victim 1 and $15,366 on behalf of Victim 2 and her minor son. These amounts are reasonable and should be expected given Defendant's heinous crimes and the severe impact on these victims.

## SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

In determining the appropriate sentence, the Court should consider the factors as set forth in 18 U.S.C. § 3553(a). Based on these factors, a sentence at the high end of the applicable 11(c)(1)(C) range is necessary.

1. The nature and circumstances of the offense

The nature and circumstances of this offense are nothing short of terrifying. Defendant targeted his wife and the mother of his young child. According to his plot, Defendant sought to have his estranged wife kidnapped, extorted, and injected with heroin, all so she would return to him. He further sought for her to be persuaded and/or forced to be intimate with Defendant. The offense required careful planning, involved a number of messages over the course of several weeks, and involved the transfer of approximately $60,000 in Bitcoin. The offense conduct, however, is not limited to Defendant's efforts to kidnap his wife. Defendant also sought out a dark web hacker to hack into various accounts belonging to his wife. This conduct demonstrated deceit, violence, greed, and a need to control his victim, who was trying to divorce him.

With respect to Victim 1, Defendant targeted a former work colleague, directing a purported dark web hitman to physically assault her: "The target should be given a significant beating that is obvious. It should injure both hands significantly or break the hands. . . ." ECF No. 1 at ¶7. Such an attack would've had a devastating effect on

Victim 1's livelihood. Thankfully, Defendant's scheme was unsuccessful, but the harm he caused continues.

2. <u>History and characteristics of Defendant.</u>

Defendant's history and characteristics are equally concerning. Although Defendant does not have any documented criminal history, his conduct in this case demonstrates efforts to obstruct justice, a pattern of domestic abuse, and a lack of remorse for his conduct in this case:

       i.    *Obstruction of Justice*

Immediately, prior to his arrest, Defendant drafted a document on his phone detailing how, if police somehow caught him, Defendant would explain sending 10,000s dollars to various dark web hitman sites. ECF No. 145 at ¶ 32. The document sought to conceal Defendant's offense by explaining away these payments as part of some plan to commit suicide. *Id.* When the FBI confronted Defendant at the Spokane International Airport shortly after Defendant returned from a trip to Mexico, Defendant plainly lied to the agents, claiming he was not responsible for plot to hire multiple dark web hitmen. *Id.* In addition to these lies, Defendant attempted to conceal his crimes by running a "shredder application" on his phone on or about April 11, 2021 – i.e., just before Defendant was interviewed by the FBI. *See* ECF No. 89 at 11 The shredder application deleted much of the content on Defendant's phone, in yet another effort to conceal Defendant's dark web activities and the offenses for which he is now being sentenced. *See id.*

Defendant's efforts to obstruct and conceal his illegal conduct continued after he was arrested in this case. Specifically, Defendant made repeated efforts to contact Witness 1, a primary witness against him. For starters, in May 2021, Defendant asked a former spouse to reach out to Witness 1. *See* ECF No. 41, Ex. 10, Call 4 at 6:45-7:15. Around that same time, Defendant cold-called called a religious group in Idaho and asked the group to call Witness 1. *See* Ex. A at 3:18 – 4:10. Then, in July 2021,

United States' Sentencing Memorandum – 9

*after* a detention hearing focused in large part on Defendant's apparent obsession with Witness 1, Defendant again reached out to Witness 1. In a handwritten letter, Defendant specifically acknowledged that reaching out to the witness could keep him in custody pending trial. The letter provided in pertinent part:

> We have a choice, [WITNESS 1], my [WITNESS 1], please join your first name with my last name. Let's build that family. I love you with every ounce of energy that God has blessed me with. I pray each night, [WITNESS 1], much like Jesus did in Gethsymane (spelling??). . . . Our union will be forever . . . . We will not need a prenuptial or postnuptial. We only need God's grace and love in our lives. . . .

> \*     \*     \*     \*     \*

> I know you are worried about cooperation + being truthful. I want you to be also. <u>Importantly, if we are married, we can decide if you testify or not. Washington law is unique in this way. One would think that you would have to testify regarding things that happened when we weren't married. That is not the case in Washington.</u>

> <u>I am taking a GIANT risk in sending you this letter, which I hope will find you. It could leave me here in this jail until trial.</u>

> \*     \*     \*     \*     \*

> <u>Please tell your lawyer that you want to us to be married as soon as possible. Today or tomorrow.</u> [My lawyer] will make it happen.

> If you are back with [your ex-husband] or hooked up with someone new, please text this to [name redacted]. The unknown is so much worse than the known. . . .

> If you want an amazing future with God leading the way, text [name redacted], "<u>Tell Ron/Sir[3], I will.</u>["]

Ex. B (emphasis added).

Based on these phone calls and the letter to Witness 1, the United States sought and obtained a no contact order precluding Defendant from contacting or asking others

---

[3] "Sir" is a title Defendant demanded that his intimate partners use when addressing Defendant. Defendant, in turn, referred to his partners as "slaves" and even demanded that his partners refer to themselves as his "slaves."

to contact this witness on his behalf. *See* ECF No. 53. This, however, did not stopped Defendant or his closest confidants from reaching out to Witness 1. Since the Court entered a no contact order, Witness 1 has reported a number of additional contacts by individuals closely associated with Defendant, including Defendant's former cellmate and Defendant's new fiancé. Specifically, last summer, almost a year after the Court entered the restraining order, Defendant's former cell mate repeatedly called Witness 1, explaining that Defendant talks incessantly about Witness 1 and that Defendant was still in love with her.[4] Ex. C (June 19, 2021 recorded call to Witness 1). Then, in October 2022, Defendant's new fiancé sent an email to Witness 1's private email account. *See* Ex. D. In the email, the new fiancé asked to meet with Witness 1, but said nothing about being in a relationship with the Defendant. *Id.* Instead, the fiancé solicited advice about a defunct construction business. Ex. D. *See also* Ex. E at 5:30 (jail call in which Defendant and the fiancé discuss Witness 1 as well as the fiancé's email to Witness 1).

The notion that Defendant's cellmate and fiancé separately discovered Witness 1's contact information and reached out to her without Defendant's knowledge or consent is non-sensical. Defendant has been obsessed with Witness 1, and he made repeated efforts to contact her. Defendant's failure to comply with the no contact order in this case demonstrates that Defendant does not take court orders seriously.

     ii.    *Domestic Abuse and Stalking*

Although Defendant does not have a prior criminal conviction for his conduct directed at his ex-wife and Witness 1, he has engaged in an escalating pattern of

---

[4] In the call, the former cellmate claims Defendant did not solicit the call and states that he (the cellmate) found Witness 1's telephone number in Defendant's Court paperwork. Ex. C. The notion that the cellmate sought out Witness 1's telephone number from Court paperwork and called Witness 1 all on his own is not credible. The only reasonable explanation for this call is that Defendant solicited his former cellmate to contact Witness 1.

domestic abuse and stalking behavior directed at the women in his life. Such abuse, which demonstrates Defendant's need to exert total control over his intimate partners, is outlined in more detail below.

- At the time Defendant sent the Dark Web messages, he was subject to a protective order. ECF No. 89 at 8-9. That order was issued based on Defendant's history of harassing his now ex-wife. *Id.* Notwithstanding the protective order and a mediated agreement that limited their contact to matters involving their minor child, Defendant continued to harass Victim 2 by writing her unwanted letters, emailing her, and waiting for her outside her place of employment. *Id.*

- In the time leading up to the Dark Web messages, Defendant left a note by his car with Victim 2's name on it, even though their mediated agreement precluded Defendant from sending such communications to Victim 2. ECF No. 89 at 9. When Victim 2 tried to ignore the letter, Defendant directed her to take it. *Id.* In the letter, Defendant attempts to manipulate Victim 2 to reconcile with Defendant, writing that he has "not moved on" and "can't" move on from Victim 2. *Id.* Defendant's letter continued, "I picture you every minute of every day. I long for you to be with me." *Id.* The letter in some ways is quite similar to the obstruction letter Defendant later sent to Witness 1, which is described above.

- As his marriage with Victim 2 deteriorated, Defendant began placing tracking devices on Victim 2's car. ECF No. 89 at 7. He did this several times, including in August 2019, April 2020, and June 2020. *Id.* These included a diagnostic tool as well as magnetic GPS trackers placed under Victim 2's car. *Id.* Defendant similarly downloaded a child tracker application to Victim 2's phone in 2019 to track Victim 2. *Id.*

- Notwithstanding Defendant was already subject to a no-contact order, Defendant repeatedly sent texts and emails about meeting, having dinner, and begging Victim 2 to reconsider her decision to separate from Defendant. ECF No. 89 at 9. Defendant literally sent hundreds of messages to Victim 2 in December 2020 – just a short time before the kidnapping plot. In these messages, Defendant detailed fantasies pertaining to the relationship with Victim 2, and he offered to pay Victim 2 if she returned to the relationship. Defendant also threatened to go to Victim 2's home despite Victim 2's opposition and the no-contact order. *Id.*

- As part of the pattern and practice of exercising control over Victim 2, Defendant directed what Victim 2 would eat as well as her workout routine.

ECF No. 89 at 8. Defendant would also drug Victim 2, including by putting Xanax in her drinks. *Id.*

- In July 2020, Defendant invited a third party – the Ilg family's 22-year-old nanny – to participate in a "kidnapping scenario" in which Victim 2 would be blindfolded, kidnapped, led outside and placed into a car." *Id.* While the "kidnapping" was discussed in the context of a "roleplay or threesome scenario," these text messages in demonstrate Defendant previously contemplated and even discussed kidnapping Victim 2. ECF No. 89 at 8.

- During his relationship with Victim 2, Defendant attempted to persuade her to return to the failed marriage by threatening to file a $10 million wrongful termination suit against his former employer. Defendant also promised Victim 2 he would give her $1,000,000 if she came back to Defendant. ECF No. 89 at 8.

- In 2021, Defendant became aggressive toward his ex-wife and even threatened her with a taser. ECF No. 41, Ex. 6 at 2. Defendant also threatened to take Victim 2's phone and car away from if she refused to call him "Sir" and did not acquiesce to his sexual requests. ECF No. 89 at 8.

- For her part, Witness 1 described being sexually assaulted by Defendant and stated Defendant physically assaulted her as well. ECF No. 41, Ex. 7 at 3. During the physical/sexual assault, Defendant pinned Witness 1 "against a wall in the bathroom and forced himself on her." Along similar lines, Defendant forced Witness 1 into a dark hole, required her to sign a "master-slave" contract in blood, and burned her with cattle prod. ECF No. 41, Ex. 8 at 4.[5]

- Text messages between Defendant and Witness 1 in June 2020 further demonstrate a pattern of domestic abuse and violence. In this messages, Witness 1 complains of being assaulted, "bleeding all over," and feeling like Defendant

---

[5] While Defendant denies these incidents and attempts to blame Witness 1 – i.e., by claiming she is the one who wanted to be placed in a hole (ECF No. 145 at ¶ 113) – the evidence demonstrates otherwise. In texts messages between Defendant and Witness 1, Witness describes how horrific it was to be placed in a septic tank. Additionally, while Defendant contends that the sexual relationship between himself and Witness 1 was consensual, audio from their trip to Mexico demonstrates otherwise. *See* Ex. F at 12:30 – 17:31.

Defendant states in the PSIR that the audio itself is demonstrative of consent. In the recording, however, Witness repeatedly tells the Defendant "No." and demands that he "stop." Ex. F.

United States' Sentencing Memorandum – 13

"broke [her] finger." ECF No. 145 at ¶ 53. Witness 1 further states, "you attacked me. And now my eyes are swelling up." *Id.* Defendant also attempted to blackmail Victim 1 by threating to expose Witness 1's marital affair, and saying he would cut off Witness 1's children if she was not submissive to Defendant. *Id.*

- Video evidence recovered during the investigation depicts Defendant, naked from the waist down, masturbating within arm's length of a young child, who appears to be asleep. While Defendant is not necessarily aroused by the minor child, such conduct – on a recorded video no less – reflects recklessness and a disregard for social norms as well as for the child's wellbeing. ECF No. 145 at 48.[6]

### iii. *Lack of Remorse*

At various points during the pendency of this case, Defendant has suggested that he – not anyone he sought to harm – is the true victim in this case. In a June 11, 2021 recorded interview with a reporter from the Daily Beast, Defendant claimed without any basis whatsoever that he was being prosecuted based on, as Defendant put it, his "sexual orientation as a dominant" in a BDSM relationship. Ex. G at 3:15. In that same call with the reporter, Defendant discussed monetizing his crimes and selling the rights to "the story." *Id.* at 4:45. He also claimed, "I never wrote any of those emails," alleging that "someone else did." *Id.* at 7:30. Similarly, in the obstruction letter to Witness 1, Defendant suggested he was the victim of a hack; rather than the person who was trying to hack his ex-wife's accounts and devices. *See* Ex. B at 4.

More recently, and subsequent to his plea agreement, Defendant sought to discount his crimes, indicating, contrary to his admissions in his plea agreement, that the facts presented in Court were not accurate. *See* Ex. H at 1:40 – 3:30 (Nov. 4, 2022 call in which Ilg states the facts and evidence presented in Court are not accurate). In

---

[6] The government has made the video available to the defense for review during the pendency of this case. If the Court determines that a review of the video is necessary, the government will provide a copy to the Court as well.

United States' Sentencing Memorandum – 14

the same call, again after Defendant's plea, Defendant again solicits a potential book or movie deal, all while discussing opportunities for financial gain based on the crimes *he* perpetrated against Victims 1 and 2. *Id.*

* * * * *

In short, Defendant's characteristics and history demonstrate that a 96 month sentence is sufficient, but not greater than necessary in this case. While Defendant may point to his education, former status as a medical doctor, and recent career challenges to explain or mitigate his criminal conduct, his efforts to obstruct justice, his pattern of domestic abuse, and lack of remorse demonstrate that a lengthy sentence is not only justified, it absolutely is necessary in this case.

3. The need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and provide just punishment

The offense conduct in this case is egregious and far from the typical case involving threats in interstate commerce. Defendant put into motion a scheme that inflicted terrible harm on his victims and their families. He selfishly sought to attack a former work colleague based on some unexplained grievance, and he attempted to force his ex-wife to remain in a loveless marriage to satisfy his own sexual desires and need for control. Once in custody, he obstructed the case by directing a witness to burn evidence relevant to Defendant's guilt. On these facts, a lengthy sentence is necessary to promote respect for the law and provide just punishment.

4. The need for the sentence imposed to afford adequate deterrence to criminal conduct and protect the public from further crimes of Defendant

As set forth herein, Defendant has attempted to obstruct justice during the pendency of this case, lied to law enforcement, has sought a book/movie deal, and repeatedly attempted to contact one of the primary witnesses against him. Much of this conduct occurred after he was confronted with evidence of his guilt.

Defendant's failure to comport his conduct with the legal and social standards of our community demonstrates both that Defendant is a poor candidate for

supervision and that he is not amenable to changing the dangerous behaviors that led to his incarceration. During the pendency of this case, Defendant was subject to a no contact order and the strictest type of supervision – custody. He knew he needed to be on his best behavior; nonetheless, Defendant begged a witness to marry him to keep her from testifying. After this letter, Defendant was precluded from contacting Witness 1; yet, his cell mate and even Defendant's new fiancé reached out to directly to Witness 1. The new fiancé, who happens to be married to another of Defendant's former cellmates, even gave an interview with a national news outlet reiterating that Defendant was still in love with Witness 1. ECF No. 145 at ¶ 115. While Defendant may ask this Court to believe that he was not responsible for these contacts and communications directed at Witness 1, this belies common sense.

Ultimately, Defendant's behavior both before his incarceration and since pleading guilty demonstrates he does not take this offense seriously and that Defendant's conduct was not some anomaly caused by a mental break. He has persisted in manipulating others to control his victims. Even now, he attempts to profit from his crimes. Such conduct demonstrates Defendant continues to be a danger to his victims and the community. A sentence at the high-end of the 11(c)(1)(C) range is therefore necessary to protect these victims and keep the community safe from Defendants future crimes.

5. <u>The need to avoid unwarranted sentence disparity among defendants with similar records who have been found guilty of similar conduct.</u>

The best way to ensure consistent sentences for similarly-situated defendants across courtrooms, districts, and the country is for courts to apply the Guidelines in the same manner everywhere. *See United States v. Saeteurn*, 504 F.3d 1175, 1181 (9th Cir. 2007); *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006); *United States v. Boscarino*, 437 F.3d 634, 638 (7th Cir. 2006). The Guidelines are the only normative way to accomplish that.

In this case, a sentence of 96 months is only slightly above the advisory guideline range and does not implicate potential sentencing disparities given the egregiousness of Defendant's conduct in this case. *See* 18 U.S.C. § 3553(a)(6). More importantly, a ninety-six month sentence accounts for the totality of Defendant's conduct, which demonstrates a pattern of escalating criminal behavior.

## MOTION FOR AN UPWARD DEPARTURE AND/OR VARIANCE

The United States submits that no less than 96 months is necessary to achieve the sentencing purposes of 3553(a). While this recommendation is slightly above the high end of the advisory sentencing guidelines range, as determined by U.S. Probation, there are several bases for a departure or variance justifying an above-guidelines sentence in this case.

Here, Defendant's conduct is outside the "heartland" for a Threats in Interstate Commerce case. The kidnapping scheme, the payments to harm Victims 1 and 2, the attempts to hack Victim 2, and the obstruction of justice in this case is "unusually heinous, brutal or degrading to the victim[s]." *See* U.S.S.G. § 5K2.8. Additionally, because Defendant sought to restrain Victim 2, U.S.S.G. §5K2.4 – abduction or unlawful restraint – also provides a rationale for adjusting upward in this case. Finally, the extreme psychological impact on the victims in this case provides another basis for an upward adjustment from the guidelines to the United States' recommended sentence. *See* U.S.S.G. § 5K2.3; *see also* ECF No. 145 at ¶ 153.

Finally, Defendant's offense conduct is akin to an attempting kidnapping. Under the kidnapping guideline, Defendant would, at an absolute minimum, be facing a guideline range from 87-108 months after his acceptance of responsibility. *See* U.S.S.G. § 2A4.1(a) (setting forth a base offense level of 32 for kidnapping). Pursuant to the kidnapping guideline, he arguably would be facing an even higher guideline if certain specific offense characteristics were found to apply. *See id.* at §2A4.1(b). Given the nature of the offense and the additional factors under § 3553(a), the United

United States' Sentencing Memorandum – 17

States submits that an-above guideline sentence of ninety-six months is appropriate. Anything less would not be a just sentence.

## REQUEST FOR A FINE

The United States generally does not request a fine in most criminal cases. This is so for numerous reasons, to include that many criminal defendants are indigent and/or unable to pay a significant fine. This is case is different and lies far afield from the heartland of criminal cases involving threats in interstate commerce. Here, Defendant threatened multiple victims, using cryptocurrency and a dark web moniker to conceal his identity. He even spent approximately $60,000 to put his scheme into effect. On these facts, and given Defendant's financial circumstances, the United States recommends a fine of $250,000 in this case.[7]

The Sentencing Guidelines specifically provide that "the court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." U.S.S.G. § 5E1.2(a) (emphasis added). Here, the imposition of a fine is mandatory under the Guidelines because the Defendant has the ability to pay a fine up to the amount requested.

In determining the imposition of fines and their amount, the Court is guided by U.S.C. § 3572(a) and U.S.S.G. § 5E1.2(d). *See United States v. Eureka Labs., Inc.*, 103 F.3d 908, 913–14 (9th Cir. 1996). As the Ninth Circuit has explained, "A sentencing court is required by 18 U.S.C. § 3572 to consider several factors when deciding whether to impose a fine and in what amount." *Eureka Labs*, 103 F.3d at 913-14. The Court, however, is not required to address every factor of § 3572 at sentencing "if the record, taken as a whole, indicates that the trial court considered the § 3572 factors." *Id.* These factors include:

---

[7] The Plea Agreement specifically provides that the United States and the Defendant are free to make whatever recommendation concerning the imposition of a criminal fine that they believe is appropriate. ECF No. 142 at ¶14.

(1) the defendant's income, earning capacity, and financial resources;

(2) the burden that the fine will impose upon the defendant, any person who is financially dependent on the defendant, or any other person (including a government) that would be responsible for the welfare of any person financially dependent on the defendant, relative to the burden that alternative punishments would impose;

(3) any pecuniary loss inflicted upon others as a result of the offense;

(4) whether restitution is ordered or made and the amount of such restitution;

(5) the need to deprive the defendant of illegally obtained gains from the offense;

(6) the expected costs to the government of any imprisonment, supervised release, or probation component of the sentence;

(7) whether the defendant can pass on to consumers or other persons the expense of the fine; and

(8) if the defendant is an organization, the size of the organization and any measure taken by the organization to discipline any officer, director, employee, or agent of the organization responsible for the offense and to prevent a recurrence of such an offense.

Here, the factors of § 3572(a) and § 5E1.2(d) favor the imposition of a fine. First, around the time of this offense, Defendant was earning approximately $716,844 per year as a neonatologist in Spokane. Ex. I at 1 (listing a monthly income of $59,737 in June 2020). In fact, Defendant practiced medicine in Spokane as a neonatologist for nearly twenty years earning millions of dollars over that time. *See* ECF No. 145 at ¶ 108. Additionally, Defendant is the co-owner of a 99 acre orchard (purchased for $1.2 million in 2008), he owns an eleven acre estate in Spokane (with an assessed

value of $1,197,000),[8] and he has various retirement accounts as well as other assets valued at more than $1.2 million. *See* Ex. J. If this were not enough, during the pendency of this case, Defendant offered a bond of $250,000 to secure his release – a request ultimately that was denied. *See* ECF No. 34 at 15 (proposing a $250,000 bond); ECF No. 49 (order denying Defendant's release pending trial). According to his financial disclosure, however, he has $240,000 in a legal counsel trust account. *See* Ex. J at 48.

Second, the United States is not aware of any burden that a fine will impose upon Defendant or any person who is financially dependent on the defendant. Again, Defendant has millions of dollars in assets. While he does have a minor child, that child is largely dependent upon his mother – Victim 2. In fact, Defendant is currently paying minimal amounts in child support on behalf of his minor son.

Next, Defendant has already agreed, as part of his plea agreement, that his criminal activity involved a substantial expenditure of funds to respond to the offense. *See* ECF No. 145 at ¶ 82. This is so given the significant financial resources Defendant expended to further his scheme as well as the expenditures required to investigate and respond to activities that were conducted surreptitiously via cryptocurrency over the dark web. Similarly, while approximately $30,000 in restitution has been requested, this is a minimal sum when compared with Defendant's assets involving real property, retirement accounts, financial accounts, a trust account, etc. Factors three and four therefore also weight in favor of a fine in this case.

The next applicable factor, the costs of incarceration, also weighs in favor of a fine in this case. If the Court imposes the Government's recommended sentence, taxpayers will incur a cost of $354,064 to keep Defendant in custody and the

---

[8] Spokane County Assessor's Website and Parel Look Up, *available at* https://cp.spokanecounty.org/SCOUT/PropertyInformation/Summary.aspx

community safe. *See* ECF No. 145 at ¶142. A fine within the applicable guidelines here – $25,000 to $250,000 – will cover some, but not all of these costs.

The final factors – whether Defendant would pass the fine along to consumers or whether Defendant is a business – either do not apply or also weigh in favor of a fine. Indeed, because Defendant is an individual and not engaged in a business, he will not be able to pass along the costs to customers.

In sum, each of the applicable factors under § 3572(a) supports the imposition of a fine. Accordingly, the United States urges the Court to impose a fine of $250,000, which is within the applicable advisory guidelines range for Defendant's offenses.

## SENTENCING RECOMMENDATION

The Government recommends the Court sentence Defendant to ninety-six months' incarceration coupled with restitution, a $250,000 fine, and three years' supervised release. Such a sentence is sufficient, but not greater than necessary to promote the sentencing factors set forth in 18 U.S.C. § 3553(a).

Respectfully submitted this 12th day of January 2023.

Vanessa R. Waldref
United States Attorney

*s/ Richard R. Barker*
Richard R. Barker
Patrick J. Cashman
Assistant United States Attorneys

## CERTIFICATE OF SERVICE

I hereby certify that on January 12, 2023 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System which will send notification of such filing to counsel of record.

_s/ Richard R. Barker_
Richard R. Barker
Assistant United States Attorney
